JOHN A. DZIAMBA *vs.* WARNER & STACKPOLE LLP & others.[1]

No. 00-P-1870.

Middlesex. July 17, 2002. - November 8, 2002.

Present: CYPHER, KASS, & COWIN, JJ.

*Rules of the Superior Court. Practice, Civil,* Summary judgment. *Anti-Discrimination Law,* Termination of employment, Handicap, Age, Sex. *Employment,* Retaliation. *Contract,* Interference with contractual relations.

A Superior Court judge, in reviewing materials submitted under Superior Court Rule 9A(b)(5) (1998) by a plaintiff responding to a defense motion for summary judgment, properly determined that the plaintiff failed to adhere to the requirements of that rule and properly took as admitted facts to which the plaintiff had not made a response that complied with the rule. [398-401]

A Superior Court judge correctly allowed a defense motion for summary judgment on a complaint claiming that the termination of the plaintiff's employment as a lawyer by the defendant law firm was the product of handicap, age, and gender discrimination, where the plaintiff failed to demonstrate that he was capable of performing the essential functions of the position involved, that the law firm failed to make a reasonable accommodation to his disability, or that his discharge was based on age or gender [404-407]; similarly, the judge properly granted summary judgment in favor of the defendant on the plaintiff's claims of breach of contract, breach of the covenant of good faith and fair dealing, wrongful termination, and intentional and negligent infliction of emotional distress, all of which were based on, or subsumed by, the discrimination claims [407, 409].

On a complaint claiming that the termination of the plaintiff's employment as a lawyer by the defendant law firm was the product of handicap, age, and gender discrimination, a Superior Court judge properly determined that the record lacked evidentiary support for a claim of retaliatory conduct by the employer [407], or for a claim that the employer tortiously interfered with advantageous business relations between the plaintiff and a client [407-409].

CIVIL ACTION commenced in the Superior Court Department on January 23, 1997.

The case was heard by *Judith Fabricant,* J., on a motion for

---

[1]Named partners of Warner & Stackpole, and a successor firm, Kirkpatrick & Lockhart LLP.

summary judgment, and motions for postjudgment relief were heard by her.

*James C. Sturdevant,* of California, for the plaintiff.

*Alan D. Rose* for the defendants.

KASS, J. On the basis of substantial evidentiary submissions, a judge of the Superior Court allowed a defense motion for summary judgment. That resulted in dismissal of John A. Dziamba's complaint that the termination of his employment as a lawyer by Warner & Stackpole LLP (W&S), a law firm, was the product of handicap, gender, and age discrimination. The amended complaint also presented claims of tortious interference with prospective business advantage and unlawful retaliation against Dziamba because he asserted his rights. The amended complaint contained other counts, e.g., libel and breach of fiduciary duty, that Dziamba does not press on appeal. We affirm.

1. *Judge's comments and ruling on plaintiff's submission under Superior Court Rule 9A(b)(5).* We have the assistance of a careful, thoughtful, and detailed memorandum of decision from the Superior Court judge who considered the materials and arguments on the motion for summary judgment. She made comments and rulings concerning the plaintiff's (as the party opposing summary judgment) statement pursuant to Superior Court Rule 9A(b)(5) (1998) that raise a threshold issue about the consequences of failure to comply with that rule. Rule 9A(b)(5) requires that a motion for summary judgment

> "be accompanied by a concise statement, in consecutive numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried, with page or paragraph references to supporting pleadings, depositions, answers to interrogatories, admissions and affidavits and a statement of the legal elements, with citations to supporting law, of each claim upon which summary judgment is sought. . . .

> "Each opposition to [the motion] shall include a response, using the same paragraph numbers, to the moving party's statement of facts as to which the moving party claims there is no genuine issue to be tried, in consecutive

numbered paragraphs, a concise statement of any additional material facts as to which the opposing party contends there is a genuine issue to be tried, with page or paragraph references to supporting pleadings . . . ."

Rule 9A(b)(5) is an "anti-ferreting" rule designed to assist a trial judge in the all-too typical situation in which the parties throw a foot-high mass of undifferentiated material at the judge. See, e.g., *A.M. Capen's Co.* v. *American Trading & Prod. Corp.*, 202 F.3d 469, 471 n.2 (1st Cir. 2000).

In accordance with the rule, the defendant,[2] the party moving for summary judgment, filed an eighteen-page statement consisting of seventy-nine short numbered paragraphs, each setting forth as undisputed a single subsidiary fact or a bundle of closely related subsidiary facts, with citation to evidence in the record supporting that assertion. For example:

"1. Plaintiff John A. Dziamba ('Dziamba') a litigation attorney, worked at W&S from July 1986 until July 7, 1995. (Affidavit of Henry T. Goldman ['Goldman Aff.'], ¶ 3."

The defendant added a six-page compilation of concise statements of principles of law, with citation of authority, as to each of the thirteen counts in the amended complaint.[3]

Dziamba's responsive statement under rule 9A(b)(5) runs seventy-nine pages, the first sixty-nine of which deal with facts that the plaintiff purports to dispute. The motion judge observed that the plaintiff's statement ignored the requirements of rule 9A(b)(5) and defeated its anti-ferreting purpose. The judge was put to the burden of ferreting through the plaintiff's rule 9A(b)(5) statement to identify what facts asserted by the defendant were in fact controverted. For example, to the simple

---

[2]Because all of W&S's partners were named as such, there are multiple defendants. For convenience of reference we refer to a single defendant throughout this opinion.

[3]The thirteen counts are: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3), (4), and (5) discrimination on bases of handicap (G. L. c. 151B), sex, and age; (6) wrongful termination; (7) and (8) intentional and negligent infliction of emotional distress; (9) defamation; (10) retaliation; (11) violation of the Massachusetts Civil Rights Act; (12) breach of fiduciary duty; and (13) tortious interference with prospective business advantage.

fact of defendant's first statement, that Dziamba worked as a litigation attorney for W&S from July, 1986, to July 7, 1995, the plaintiff's response was: "Disputed." There follow three and one-half pages that set out what a successful, capable, imaginative, and productive lawyer Dziamba was at W&S. That was not an atypical response. That Dziamba was a litigation lawyer there for nine years was never controverted; i.e., it was not disputed. The very next statement by the moving party, consisting of five lines, was met with a response of eight and one-half pages which, in the end, did not controvert the facts stated by the moving party.

The third paragraph of rule 9A(b)(5) provides:

> "For purposes of the motion for summary judgment, facts contained in a statement described in the first paragraph hereof shall be deemed to have been admitted unless controverted in the manner set forth in the second paragraph hereof."

Such was the failure of the plaintiff's responsive statement to adhere to the requirements of rule 9A(b)(5), the motion judge ruled, that she took as admitted all seventy-nine paragraphs of W&S's statements of fact save one: paragraph number thirty-five. Paragraph thirty-five stated that Dziamba worked at Davis, Malm & D'Agostine from July, 1995, until March, 1996, when he was terminated by that firm. Here the plaintiff's response was crisp and on target. It said: "Dziamba was not terminated by Davis, Malm. . . . Moreover, the terms of plaintiff's separation from any subsequent employer are irrelevant." While possibly relevant, the circumstances of the plaintiff's leave taking from Davis, Malm were certainly not material to the questions before the judge on summary judgment, as she noted.

On the basis of our review of the record, there were other instances in which the plaintiff's response placed assertions of fact in dispute, but those facts were not material ones. It would unreasonably lengthen this opinion were we to proceed paragraph by paragraph through the parties' rule 9A(b)(5) statements to illustrate the plaintiff's compliance or noncompliance with the rule. We think the judge fairly characterized the plaintiff's response when she observed that factual assertions were buried deeply in argument and that the way factual asser-

tions were woven into argument made it unnecessarily and unreasonably difficult to identify which facts were genuinely in dispute.

The plaintiff challenges the rule-making authority of the Superior Court to require submissions other than those required by Mass.R.Civ.P. 56, 365 Mass. 824 (1974), and more particularly to take as admitted facts to which the plaintiff has not made a response that complies with the rule. Decisions based on analogous local anti-ferreting rules in United States District Courts support the action taken by the motion judge. Adoption of an anti-ferreting rule is an appropriate exercise by a trial court of case management discretion. It is a pragmatic and reasonable response to the propensity of lawyers to file literally mounds of affidavits, depositions, interrogatories, and depositions in support of, or in opposition to, summary judgment. Both formulation of such rules and administering them in a fashion so that they have bite find support in the cases. See *Stepanischen* v. *Merchants Despatch Transp. Corp.*, 722 F.2d 922, 931-932 (1st Cir. 1983); *Rivas* v. *Federacion de Asociaciones Pecuarias de P.R.*, 929 F.2d 814, 816 n.2 (1st Cir. 1991); *Ayala-Gerena* v. *Bristol Myers-Squibb Co.*, 95 F.3d 86, 95 (1st Cir. 1996); *A.M. Capen's Co.* v. *American Trading & Prod. Corp.*, 202 F.3d at 472; *Ruiz Rivera* v. *Riley*, 209 F.3d 24, 27-28 (1st Cir. 2000). The judge acted within her discretion in taking as admitted those facts asserted by the moving party (W&S) that were not disputed by the party opposing the motion for summary judgment (Dziamba), in accordance with the rule.

Although the action that the judge took under rule 9A(b)(5) was fully warranted, she added suspenders to that belt by independently "review[ing] the evidentiary materials submitted by the plaintiff, and . . . consider[ing], in the light most favorable to the plaintiff [i.e., the nonmoving party], those additional facts that [the court] deems material, and that are supported by admissible evidence . . . ."

2. *Facts.* We have also combed the record and now set forth the material facts that, without weighing the evidence, are not disputed.

Dziamba was first admitted to the bar in Connecticut in 1969.

He joined W&S in the status of "counsel" in July, 1986. At that time, lawyers at W&S were divided into four categories: associate, counsel, nonequity partner, and partner. Dziamba's area of professional concentration was litigation. Effective January 1, 1990, Dziamba became a nonequity partner. This meant that W&S held him out to the world as a partner, although internally he was not required to maintain a capital account, could not attend partnership meetings except by invitation, did not share in the partnership's profits and losses (a nonequity partner's compensation was set by the firm's executive committee), and did not have the benefit of the partnership agreement procedures involving the involuntary withdrawal of partners.

On January 10, 1991, W&S's executive director recommended to the firm's executive committee that, to cut costs, they should discharge certain lawyers. Dziamba was among those identified as expendable. In November, 1991, Dziamba applied for full partnership status but, after meeting with the executive committee, withdrew his application. He did not receive a compensation increase for 1992, W&S's executive committee having decided his performance did not warrant it. During this period, the administrative partner of W&S was Henry Goldman, and the administrator of the litigation department was Joseph Leghorn. Those two met with Dziamba on March 5, 1992, in Dziamba's office. They informed him of the decision not to increase his compensation and of the executive committee's general concerns about his progress at W&S. There was a perception, they told Dziamba, that he had not progressed well in originating clients and that other lawyers in the litigation department were reluctant to assign matters to him because they thought he was wont to spend more time on cases than could be billed. Goldman and Leghorn told Dziamba that he needed to market himself inside and outside of the firm. In six months, they informed him, the executive committee would review the situation.

At that March 5 meeting, Dziamba said that he had not been feeling well and had not been sleeping well. From what Goldman and Leghorn had said to him, Dziamba felt as if he had been fired. After the meeting, Dziamba left the office. He was suffering from what in the weeks following was diagnosed as

major recurrent depression. Treatment for that illness requires medication and, from time to time, change in the medication. Dziamba told Goldman about his illness in a telephone call on March 26, 1992, and in more detail when he returned to work on a part-time basis in April, 1992.

When Goldman learned about Dziamba's clinical problem he told him to take care of himself and to take the time needed to get better. The firm would see that his cases were covered. Until Dziamba's call of March 26, 1992, partners at W&S had not known that Dziamba was suffering from an illness that was periodically disabling. The necessary altering and experimenting with his medications, from time to time, made Dziamba, as he described it to Goldman several years later in 1994, feel he "was in molasses." After Dziamba came back to work in April, 1992, there were periodic meetings between Goldman and Dziamba at which Goldman said, among other things, that it was not merely a matter of hours — Dziamba should not work more than was medically appropriate — but that the underlying problem was still the perception that he lacked the ability to handle cases efficiently and to inspire the confidence of clients.[4]

In the spring of 1993, Dziamba again applied for equity partnership. The executive committee did not so recommend and took like negative action with two other candidates. In view of Dziamba's gender discrimination claim, it bears mentioning that those other two lawyers not then elevated to equity partner status were women. Three other candidates were elected as full partners, of whom one was a woman working in the environmental law field. Each of the new equity partners had developed a strong constituency for his or her services.

In February, 1994, the executive committee of W&S concluded that Dziamba was the least valuable of their commercial litigators, and Goldman gave Dziamba the bad news. He was to leave May 31, 1994. Dziamba sought the advice of counsel. The firm decided to postpone the departure date, but effective July 1, 1994, it cut Dziamba's annual compensation to $66,000. On July 12, 1994, Dziamba filed a charge with the

---

[4]Dziamba had proposed in a memorandum dated October 7, 1992, a goal of 135 billable hours per month from October, 1992, to December, 1992, as a reasonable accommodation.

Massachusetts Commission Against Discrimination against W&S and its equity partners that alleged W&S had discriminated against him because of his handicap, his age, and his sex, and that the firm had retaliated against his request for a reasonable accommodation to his handicap by reducing his salary. On June 28, 1995, there was a special partnership meeting, at which Dziamba was permitted to make his case for continuing at W&S. The partners voted twenty-one to one against him. Dziamba left W&S in July, 1995. We shall mention other undisputed facts, when relevant, in connection with our discussion of Dziamba's various claims.

In reviewing the claims asserted by Dziamba, we view the facts contained in the summary judgment materials in the light most favorable to the nonmoving party, here, the plaintiff. *Tardanico* v. *Aetna Life & Cas. Co.*, 41 Mass. App. Ct. 443, 448 (1996).

3. *The discrimination claims.* (a) *Based on handicap.* Dziamba's primary claim is that W&S dismissed him because of a handicap he suffered, namely, major recurrent depression. See G. L. c. 151B, § 4(16), as appearing in St. 1983, c. 533, § 6. To maintain that claim, Dziamba must demonstrate that he is a "qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation." *Ibid. Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 449-450 (2002). Dziamba has failed to make that fundamental showing.

Dziamba was a lawyer in W&S's commercial litigation department. An essential function of a nonequity partner at W&S included handling litigation in a manner that was cost-efficient and that won the confidence of the client. As described in letters, memoranda, and depositions, the job of a senior litigator at W&S also included generating a market for his services through the origination of new clients (being a "finder") or generating a market for his service internally with lawyers at W&S (being a "minder" and "binder" of clients of the firm). In neither aspect of those essential functions had Dziamba enjoyed success, as shown by internal manifestations of dissatisfaction with his performance in 1991, and the discussion of the firm's concern about that performance with Dziamba start-

ing with the meeting on March 5, 1992. The work of a lawyer is often highly demanding of physical and psychic energy. It requires responses to often simultaneous external pressures from courts, opposing counsel, and clients. There is no evidence that W&S held other lawyers in the firm to less demanding essential functions.

All the same, Dziamba contends that the firm failed to make reasonable accommodation to his disability. The evidence is that the firm allowed him, indeed encouraged him, to work less than full time in hope that his condition would stabilize. On his own motion, Dziamba suggested lower quotas of billable hours per month: 100 hours per month for May through September, 1992; 135 hours per month for October through December, 1992; and 130 hours per month for January through March, 1993. There follow in the record a series of memoranda by Dziamba in 1993 and 1994 to the executive committee that report fatiguing effects from changes in medication and request reasonable accommodation. Dziamba's billable hours in 1994 were 687. What reasonable accommodation W&S was to make, Dziamba's memoranda do not say.

To fulfill their obligation of a reasonable accommodation to a handicap, employers need not make substantial changes in the standards of a job. *Beal* v. *Selectmen of Hingham*, 419 Mass. 535, 542 (1995). *Wynne* v. *Tufts Univ. Sch. of Medicine*, 932 F.2d 19, 25 (1st Cir. 1991), on remand, 976 F.2d 791, 795 (1992), cert. denied, 507 U.S. 1030 (1993). So if, hypothetically, the norm of billable and collectible hours expected of a senior litigator in a law firm were 1800 per year, then a lawyer who could do no more than 1200 billable and collectible hours would not be performing the essential function of the position involved.

There is some reference in the record to a request by Dziamba that he be appointed director of training for the firm. No such position existed at W&S. An employer is not required to create a new position as a reasonable accommodation to the handicapped employee. *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. at 454. *Reidy* v. *Travelers Ins. Co.*, 928 F. Supp. 98, 109 (D. Mass. 1996), aff'd, 107 F.3d 1 (1st Cir.), cert. denied, 522 U.S. 809 (1997). Nor does reasonable accommodation require

an employer to wait an indefinite period for the recovery of an employee who has a medical condition that bears on job performance. *Russell* v. *Cooley Dickinson Hosp., Inc., supra* at 455. *Watkins* v. *J&S Oil Co.,* 164 F.3d 55, 61-62 (1st Cir. 1998).

Dziamba attributes his productivity decline to partners at W&S shunning him after they learned he was suffering from depression. As the Superior Court judge remarked, that assertion runs into the awkward, undisputed fact that, before the partners at W&S knew anything about Dziamba's illness, they were reluctant to assign work to him. Those are the facts that led to the March 5, 1992, meeting at which Goldman and Leghorn warned Dziamba that he had to create a market for his services, either from new clients or from within the firm. That did not change after Dziamba's condition became known within the firm. Contrast *Labonte* v. *Hutchins & Wheeler,* 424 Mass. 813, 814 (1997).

(b) *Based on age and sex.* As a preliminary matter, Dziamba's claims of age and sex discrimination founder on the same difficulty as before, i.e., he has not met the burden of showing that he is a qualified person capable of performing the essential functions of his position. There is also no evidence that the discharge of Dziamba was based on age or sex. There is no evidence that he was replaced with a younger woman or replaced at all. In 1994, three younger lawyers were elevated to nonequity partner status, but during the 1993, 1994, and 1995 fiscal years they achieved dramatically higher billable hours. Parenthetically, Dziamba was hired by W&S at age forty-two and promoted to nonequity partner status at age forty-five, with many of the same partners involved in the promotion and removal decisions. See *Grossman* v. *Dillard Dept. Stores, Inc.,* 109 F.3d 457, 459 (8th Cir. 1997); *Chiaramonte* v. *Fashion Bed Group, Inc.,* 129 F.3d 391, 399 (7th Cir. 1997), cert. denied, 523 U.S. 1118 (1998). Those cases state that it is improbable that the same persons who hire or promote someone already in an older age bracket will suddenly develop an aversion to older people.

As to sex-based discrimination, of the twenty-two equity partners at W&S who voted to part with Dziamba, twenty were male. Of the three lawyers promoted to full partner status in

1993, one was a woman who, as noted, had developed a strong constituency within the firm. The facts as developed do not suggest that Dziamba has any reasonable expectation that he can establish essential elements of an age or sex discrimination claim. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

4. *Other claims.* (a) *Breach of contract.* Insofar as Dziamba's breach of contract claim is based on unfair discrimination by W&S against him, the claim is swallowed up by the claims made — and discussed — under G. L. c. 151B. See, e.g., *Green* v. *Wyman-Gordon Co.*, 422 Mass. 551, 557-558 (1996). By the terms of the partnership agreement of W&S, Dziamba, as a nonequity partner, did not have any rights to the removal procedures that applied to equity partners.

(b) *Breach of covenant of good faith and fair dealing.* There is no evidence that W&S severed Dziamba from employment to exploit client connections he had made or to cut him off from benefits or bonus entitlements. See and compare *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 101-104 (1977). To the extent this claim rests on alleged discriminatory conduct, it is subsumed in the handicap, age, and sex discrimination claims.

(c) *Retaliation.* This count asserts that W&S retaliated against Dziamba because he exercised his civil rights by asking W&S for reasonable accommodation to his affliction and by lodging a complaint against W&S with the Massachusetts Commission Against Discrimination. Concerning Dziamba, expressions of dissatisfaction, warnings about unsatisfactory accomplishment, and not raising his salary had begun well before Dziamba, as the Superior Court judge put it, "had done or said anything that could be characterized as an exercise of protected rights." After Dziamba had asked for reasonable accommodation, in addition to acceding to time expectations that were below W&S's norms, the firm funded out-of-State trips which Dziamba made for purposes of client development. The judge rightly concluded that the record lacked evidentiary support for a claim of retaliatory conduct by the employer. See *Tate* v. *Department of Mental Health*, 419 Mass. 356, 364-365 (1995).

(d) *Tortious interference with prospective business advantage.* During 1994, Dziamba developed some new business with The

First National Bank of Boston, as client, to close franchising loans that the bank was making to a doughnut chain. At the time of his leave-taking from W&S, the bank had referred four loans to him. An associate at W&S, Kathleen Woodard, was in the process of closing two such loans, two having apparently been completed. Dziamba wrote a letter to the bank announcing that he was joining the firm of Davis, Malm & D'Agostine and that he would be pleased to continue handling those transactions, but offering the bank the choice of staying with W&S. See, as to the approved content of such a letter, *Meehan* v. *Shaughnessy*, 404 Mass. 419, 437 (1989). In response, the bank authorized transfer of the files to Dziamba at his new practice venue. During the course of a telephone conversation between Woodard, who had been at work on the transactions, and the assistant vice-president at the bank who was managing the loans, the bank officer indicated that she would just as soon have Woodard finish the job. Woodard sent to the bank officer a letter confirming that she was to finish those two matters, notwithstanding the prior instruction to turn the files over to Dziamba. The bank officer countersigned that letter to indicate her assent and returned it to Woodard.

That letter and the telephone conversation on which it is based were the only evidence of communication between W&S and the bank. The tort of wrongful interference with advantageous business relations requires proof by the plaintiff that he had a contract with a third party; that the defendant knowingly induced the third party to break the contract; that the plaintiff was harmed by the defendant's actions; and that the defendant acted with an improper motive or means. *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 816 (1990). *Schwanbeck* v. *Federal-Mogul Corp.*, 31 Mass. App. Ct. 390, 412 (1991), *S.C.*, 412 Mass. 703 (1992). Even taking Woodward's letter as soliciting the work of completing those two closings, which would be a stretch, rather than as an acknowledgment of the client's wishes, competing for business is permissible so long as it does not employ wrongful means. *Doliner* v. *Brown*, 21 Mass. App. Ct. 692, 695 (1986). There was no evidence that anyone at W&S made disparaging comments about Dziamba to the bank, that anyone made any false statements, or that anyone tried to

use some improper leverage to coerce the bank into staying with W&S (a wholly implausible scenario considering the relative economic power of a large bank to that of a law firm). There was, indeed, no evidence that the bank sent further business involving the doughnut chain to W&S. As to why the bank did not send further doughnut chain business to Dziamba's new firm, the record offers only a question mark. The judge rightly allowed summary judgment for the defendant on the tortious interference count.

(e) *Residual counts.* The counts for intentional and negligent infliction of emotional distress and wrongful termination are based in W&S's alleged disability, age, and sex discrimination and are subsumed in the claims under G. L. c. 151B.

We do not consider the counts in the complaint based on libel, violation of the Massachusetts Civil Rights Act (G. L. c. 12, §§ 11H, 11I) and breach of fiduciary duty, as they were not pressed on appeal.

5. *Postjudgment motions.* Postjudgment motions by the plaintiff under Mass.R.Civ.P. 59(e), 365 Mass. 828 (1974), and Mass.R.Civ.P. 60(b), 365 Mass. 828 (1974), essentially reargued the case. The motion judge acted within her discretion in denying the motions. Her memoranda in support of those denials reflect that the judge gave the motions thoughtful consideration.

*Judgment affirmed.*

*Order denying postjudgment motions affirmed.*