Gants, J.
The plaintiff Webert Montlouis (“Montlouis”) has filed a second amended complaint against his former employer, the defendant Pirus Networks, Inc. (“Pirus”), and its Executive Vice President of Technology, defendant Richard Corley (“Corley”), alleging that Pirus and Corley:
1. terminated him and subjected him to a hostile work environment because of his race and national origin, in violation of G.L.c. 15 IB, §4(1);
2. retaliated against him after he orally complained to his supervisor, Douglas Wood (“Wood”), Pirus’s Vice President of Engineering, that the proposed promotion of Paul Sweeney (a white engineer) would be unfair, in violation of G.L.c. 151B, §§4(4);
3. breached Pirus’s oral agreement to employ him for four years and to grant him stock options in Pirus;
4. breached its implied-in-fact contract with him by wrongfully discharging him and refusing to grant him stock options;
5. breached the implied covenant of good faith and fair dealing by terminating him before the promised stock options had vested;
6. wrongfully terminated him because of his race and national origin, in violation of public policy;
7. negligently inflicted emotional distress upon him through its discrimination; and
8. were unjustly enriched at his expense.
The defendants have moved for summary judgment as to all of plaintiffs claims. After hearing, for the reasons detailed below, the defendants’ motion for summary judgment is ALLOWED as to all of plaintiffs claims.

BACKGROUND

In evaluating a motion for summary judgment, this Court must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the nonmoving party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). Consequently, the facts stated below are presented in the light most favorable to Montlouis and should not be misunderstood as findings of the Court.
Pirus was a start-up corporation formed to create, design, and market an Internet Protocol storage networking system known as a Storage Utility Switch. Montlouis was hired by Pirus to join its technical staff as a senior level designer and commenced work on May 7, 2000. Montlouis obtained his job interview at Pirus through Logix, an employment placement firm, and interviewed with Corley, Wood, and Brian Schofer. Wood made the decision to hire Montlouis based, in part, on Corley’s recommendation. In Corley’s interview with Montlouis, Corley told Montlouis that Pirus would proceed to an initial public offering and would not be sold to another company. Corley said Montlouis would be employed by Pirus for at least four years, and then would receive equity in Pirus under its 2000 Stock Option Plan, which provided for a four-year vesting period for those options.
On or about April 19, 2000, Pirus made Montlouis a written offer of employment, which provided for $110,000 in annual salary, a signing bonus of $7,500, and an option to purchase 28,000 Pirus shares through participation in its Stock Option Plan. Wood separately agreed to establish a tuition reimbursement program for Montlouis. The written offer of employment explicitly provided that Montlouis’ employment would be at-will, stating, “Your employment with Pirus Networks is entirely voluntary for both parties and either you or Pirus Networks may conclude the employment relationship at any time for any reason.” The Stock Option Plan referenced in the written offer of employment also made clear that it should not be understood as a promise of continued employment. In the first sentence of paragraph 9, it declared;
Nothing contained in the Plan or this Agreement shall be construed or deemed by any person under any circumstances to bind the Company to continue the employment of the Employee for the period within which this Option may be exercised, nor shall the Plan or this Agreement create any duty of the Company or any of its affiliates or other shareholders to the Employee, comparable to the duties which partners or joint venturers may owe to each other.
Montlouis accepted the offer of employment in writing on April 24, 2000.
When Montlouis began his employment, Pirus had 38 other employees; Montlouis was the only black employee. When Montlouis’ employment was terminated, Pirus had grown to 121 employees, but Montlouis remained the only black.
The Storage Utility Switch that Pirus was created to design and market allows computers using various storage protocols to connect with storage devices from different vendors. The primary hardware components of the Storage Utility Switch are a Storage Resource Card and a Switch Fabric Card. A key component of the Storage Resource Card is a Direct Memory Access (“DMA”) chip. As a senior level designer, Pirus assigned Montlouis the overall responsibility to design and program the DMA chip. To successfully design the DMA chip, Montlouis needed to program it to pass information to the Queue Manager. By early October 2000, Montlouis reported to Wood that he was 90% completed in programming the base functionality of the DMA chip. To determine if Montlouis had successfully programmed the DMA chip, it had to be “debugged,” which could not occur until Pirus received the Storage Resource Card on which the DMA chip was to sit, which did not occur until November 2000. Once the de-bugging of the DMA began, it became apparent that the DMA could not communicate information with the Queue Manager. The reason was that, based *279 on the instructions he had been given by Corley and Wood, Montlouis had programmed the DMA chip to support “burst” transactions but the Queue Manager could only support “single-beat” transactions.[1] Consequently, the DMA chip needed to be redesigned to support “single-beat" transactions. Corley and Schofer were assigned to assist Montlouis in this effort, which was given the name “Thunderdome” and completed in roughly three weeks. The magnitude of this error and the remedial action required was unprecedented at Pirus. Because Corley and Schofer needed to be shifted to work on “Thunderdome,” they were unavailable to work on their own projects for the Storage Utility Switch, which pushed the project even further behind.
After “Thunderdome,” Montlouis was given further tasks to perform on the DMA chip. Pirus developed a schedule for the completion of these tasks. Montlouis eventually completed these tasks but all were completed behind schedule. Montlouis was not the only Pirus engineer to be late in completing his tasks; Corley and Paul Sweeney were equally or more late on many of their tasks.
In or around August 2000, roughly three months after Montlouis began work with Pirus, Wood considered promoting Sweeney to a new position — Director of Component Engineering. Wood did not consider Montlouis for this position because he thought that Sweeney was more senior and more appropriate for the position than Montlouis. In keeping with his normal practice when he considered an employee for promotion, Wood asked several Pirus engineers, including Montlouis, what they felt about the proposed promotion for Sweeney. When Wood asked Montlouis, he paused, thought about it, and told Wood he would get back to him tomorrow. Wood acknowledged in speaking with Montlouis that Montlouis had more experience in chip design and verification than Sweeney, and that Montlouis was probably asking why it was not him being considered for the promotion. The next morning, Montlouis told Wood “that it would be unfair to me, that [sic] basically would affect me at Pirus.” Sweeney ultimately did not get this promotion. Wood later told Montlouis that other persons also had concerns with Sweeney. Montlouis does not allege that Wood discriminated against him on the basis of his race or national origin in not considering him for this promotion. Indeed, Montlouis testified in his deposition that he did not believe Wood ever discriminated against him on the basis of either his race or national origin.
Montlouis contends that the hostile work environment began after he was assigned to work on the DMA chip in July 2000 and continued until his termination. In describing why he believed the work environment had been hostile, he declared that he was never treated as part of the “Corley Crew” of white engineers. Corley, Wood, Sweeney, and Schofer acted differently towards each other than toward Montlouis. He noted that Corley gave him the “cold shoulder,” asked him questions in a “strange" manner, and did not say “hi” to him as often or take him out to lunch as often as he used to. He also notes that Schofer did not share information with him about the problem with the Memoiy Controller, but had told other white engineers about the problem. Montlouis also was upset about what he characterized as the “sabotage” of his work, which was actually the copying and revision of his computer files without his knowledge or permission when he was absent from work. William Watts, Pirus’s Director of Hardware Engineering, was aware of the copying and revision of Montlouis’ computer files, but testified that this was not intended to sabotage Montlouis’ work but to allow the design team to continue to work in Montlouis’ absence on DMA chip development.
Montlouis also testified that a talk radio station was left on in the laboratory during the day and, on one occasion, the radio announcer said that all immigrants should go back home. Corley and the others in the room were laughing and joking about the statement. Montlouis testified to another incident, which occurred around May 2001. While he was returning from lunch with Corley and Sweeney, Sweeney asked him what he was going to do with all the money when Pirus “makes it,” “buy a big gold chain like Mr. T?” Both Corley and Sweeney laughed at this question. These two incidents were the only comments he ever heard at Pirus that concerned his race or national origin.
Throughout his employment with Pirus, Montlouis never suffered a decrease in salary, was never given assignments that were inappropriate for a person with his background and experience, never stopped being invited to weekly hardware group meetings, and never stopped interviewing prospective employees.
In the summer of 2001, Pirus reviewed the performance of each of its engineering employees to determine who, if anyone, was not performing adequately. These reviews were based strictly on performance and were not part of a planned reduction in force. Three employees were determined to be performing below expectations — Montlouis, a white male, and a white female. Each were terminated. Although Corley was asked his opinion as to whether Montlouis should be terminated, Wood was solely responsible for the termination decision. Montlouis was terminated on July 27, 2001. After his termination, his work was performed by multiple persons, but Schofer was the engineer primarily responsible to carry the design forward.

DISCUSSION

To prevail on summary judgment, the moving party must establish that there are no genuine issues of material fact as to any element of a claim and that it is entitled to judgment as a matter of law on that claim.
*280 See Mass.R.Civ.P. 56(c); Highlands Insurance Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997). Where, as here, the party opposing summary judgment has the burden of proof at trial, the moving party is entitled to summary judgment if it “demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party’s claim.” Id. It is sufficient to demonstrate that “proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
Since each of Montlouis’ claims raise separate issues, this Court will consider each claim in turn.

1.Race and National Origin Discrimination: Termination

In evaluating whether a discrimination claim under Chapter 15IB survives summary judgment, Massachusetts courts use the same three-stage analysis originally devised by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) to address Title VII discrimination claims. Wynn & Wynn, P.C. v. Massachusetts Commission Against Discrimination, 431 Mass. 655, 665 (2000); Blare v. Husky Injection Molding Systems Boston, Inc., 419 Mass. 437, 440 (1995). In the first stage, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Blare, 419 Mass, at 441. Once the prima facie case is established, the plaintiff enjoys a presumption of discrimination that entitles the plaintiff to judgment unless and until the defendant rebuts the presumption “by articulating a legitimate, non-discriminatory reason for its [termination] decision.” Id. Once the defendant satisfies this burden of production, the presumption vanishes, and the plaintiff bears the burden of persuasion at the crucial third stage to establish either that the employer’s articulated reason was a pretext or that the actual reason for the termination decision was discrimination. Id. at 444.
In a traditional employment discrimination case, as here, where the plaintiff has been terminated and the discrimination case rests on circumstantial evidence, the first stage showing of prima facie discrimination generally is satisfied by proving four elements:
1. the plaintiff belongs to a class that is protected by G.L.C. 15 IB;
2.he performed his job acceptably;
3. he was terminated; and
4. his employer sought to fill the plaintiffs position by hiring another individual with qualifications similar to the plaintiffs.
Id., at 441; Wynn & Wynn, P.C., 431 Mass, at 665.
Applying those four elements here, Montlouis plainly belongs to a protected class and he was certainly terminated. While Pirus vigorously contends that Montlouis did not perform his job acceptably, there remains here, as in virtually every employment discrimination case, a genuine issue of material fact as to whether Montlouis’ work performance was acceptable. Given the technical nature of the work that Montlouis performed, his contention that he was instructed to program the DMA chip to support “burst” transactions, his ultimate completion of the work he was given, and disputes in the record as to whether his work was more behind schedule than other engineers who were not fired, this Court cannot find as a matter of law that Montlouis’ work performance was unacceptable. As to the fourth element, while the record is clear that no new employee was hired to replace Montlouis, there is evidence that his work was performed by other engineers, primarily Schofer, who had qualifications similar to Montlouis.
Therefore, viewing the evidence in the light most favorable to Montlouis, there is a genuine issue of material fact as to whether Montlouis may prove his prima facie case.
Pirus, however, has articulated a legitimate, nondiscriminatory reason for its decision to terminate Montlouis — that it believed he was not meeting his performance expectations. With Pirus having furnished this explanation, this Court, in deciding this summary judgment motion, must determine whether Montlouis has any reasonable expectation of proving that this articulated reason was a pretext or that the actual reason for the hiring decision was discrimination. See Kourouvacilis v. General Motors Corp., 410 Mass, at 716; Blare, 419 Mass, at 444. This Court finds that, even viewing the evidence in the summary judgment record in the light most favorable to Montlouis, he does not have any such reasonable expectation.
The fatal flaw in Montlouis’ discrimination claim regarding his termination is that there is no dispute that Wood was responsible for the decision to terminate and Montlouis concedes that Wood never discriminated against him on the basis of either his race or national origin. Wood attests that he based his termination decision on Montlouis’ failure adequately to design and program the DMA chip and to complete in a timely fashion the various tasks assigned to Montlouis after the completion of the Thunderdome project. While Wood solicited the opinions of other Pirus employees, including Corley and Watts, in reaching this decision, there is no evidence that he was provided with false or misleading information regarding Montlouis’ performance by anyone that Wood relied on in reaching his judgment of Montlouis’ performance. Compare with Cariglia v. Hertz Equipment Rental Corporation, 363 F.3d 77, 85-86 (1st Cir. 2004) (discrimination may be found when the termination decision is made by individuals without dis *281 criminatory animus who relied on false or misleading information provided by the plaintiffs supervisor, who bore such animus). Indeed, Wood was Montlouis’ direct supervisor and had personal knowledge regarding Montlouis’ performance. While one reasonably may differ with his appraisal of Montlouis’ performance, Montlouis agrees that Wood did not act with any discriminatory intent. Therefore, summary judgment must be granted as to Montlouis’ claim that his termination was caused by race or national origin discrimination.
2. Race and National Origin Discrimination: Hostile Work Environment
Montlouis claims that he was harassed and discriminated against on the basis of his race and national origin in the conditions of his employment through the creation of a hostile work environment. “A hostile work environment is one that is ‘pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace.’ ” Cuddyer v. The Stop & Shop Supermarket Company, 434 Mass. 521, 532 (2001), quoting College-Town v. Massachusetts Commission Against Discrimination, 400 Mass. 156, 162 (1987). See also Gnerre v. Massachusetts Commission Against Discrimination, 402 Mass. 502, 507-OS (1988) (sexual harassment, to be actionable, must be sufficiently pervasive to alter the conditions of the victim’s employment). To prevail on this claim, Montlouis must show not only that he suffered harassment that made his employment significantly less desirable to him, but also that the harassment “was of such a nature that it would make the plaintiffs [employment] significantly less desirable to a reasonable person in the plaintiffs position.” Gnerre, 402 Mass, at 506-07.
Even viewing the evidence in the light most favorable to Montlouis, there is not sufficient evidence in the summary judgment record to permit a finding that Montlouis’ work environment was so “pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization," that it made Montlouis’ employment significantly less desirable to a reasonable person in his position. See Cuddyer, 434 Mass, at 532; Gnerre, 402 Mass, at 506-07. From Montlouis’ testimony, one arguably can infer that he found it to be a hostile work environment, but that does not necessarily permit a reasonable inference that a reasonable person in his position would have found it to be so. When one looks closely at the evidence that Montlouis has proffered in support of his claim of a hostile work environment, one finds, as Gertrude Stein said of Oakland, that “there is no there there.”
The only comments about his race and national origin that he can point to were:
laughter and joking by his fellow engineers at a talk radio announcer’s statement that all immigrants should go home; and
a fellow engineer (Sweeney) asking him whether he was going to “buy a big gold chain like Mr. T’ with the money he would earn if Pirus “makes it.”
As to the former, the statement by the radio announcer was certainly not directed at him, and Montlouis does not even allege that his fellow employees focused on him once the statement was made. Nor does he allege that anyone supported this inane statement; he simply testified that they laughed and joked about it. As to the latter, the question was asked when he, Sweeney, and Corley were returning from lunch, and nothing more was ever said about it. Such comments, at worst, fall into the category of stray remarks that, by themselves, cannot suffice to establish a hostile work environment. See generally Clark County School District v. Breeden, 532 U.S. 268, 271 (2001) (simple teasing, offhand comments, and isolated incidents, unless extremely serious, do not create a hostile work environment); Wynn & Wynn, P.C., 431 Mass, at 667.
Nor would a reasonable person have found Montlouis’ work environment to be hostile when one considered his contention that he was not part of the “Corley Crew” of engineers. The fact that the “Corley Crew” were all white engineers means little, since Montlouis was the only black employee and there were only a handful of Asian employees during his employment. In essence, the only evidence that Montlouis can muster is that he was not treated as warmly by Corley as other engineers and was not among those who were personally close to him. This can hardly support a hostile environment claim, especially when one considers that Corley recommended that Montlouis be hired following his interview, presumably knowing that Montlouis was a black Haitian. See LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 847 (1st Cir 1993), cert. denied, 511 U.S. 1018 (1994) (strong inference that person responsible for hiring plaintiff is unlikely to discriminate against him shortly thereafter).
Nor, upon closer scrutiny, does the most serious allegation — "sabotage" of Montlouis’ work — rise to the level of hostile environment discrimination. What Montlouis characterized as “sabotage” was simply other engineers on the design team using his computer to copy and revise his computer files so that they could continue to work in Montlouis’ absence on DMA chip development. While it would have been more polite to have asked him for permission or to have told him that they had revised his files, this conduct, even considered in conjunction with the other alleged conduct, is not sufficient to constitute the pervasive hostile environment that reasonably may be viewed as altering the conditions of Montlouis’ employment. In short, the evidence in the summary judgment record, even when viewed generously and cumulatively, would not permit *282 any reasonable factfinder to conclude that a reasonable person in Montlouis’ position would have considered his fellow employees’ conduct to be pervasive racial or national origin harassment and abuse that made the workplace a hostile environment. Therefore, summary judgment must be granted as to Montlouis’ claim that he suffered race and national origin discrimination through a hostile work environment.
3. The Claim of Retaliation
“To establish a prima facie case of retaliation, a plaintiff must show that he engaged in legally protected conduct; he suffered an adverse employment action; and a causal connection existed between the protected conduct and the adverse action.” Mole v. University of Massachusetts, 58 Mass.App.Ct. 29, 39 (2003). The legally projected conduct must involve the plaintiffs opposition to a practice forbidden under Chapter 151B. Id. at 40; G.L.c. 151B, §4(4). Phrased differently, to succeed on a claim for retaliation in violation of G.L.c. 151B, a plaintiff must prove: (1) that he believed in good faith that his employer was engaged in wrongful discrimination; (2) that he acted reasonably in response to his belief; and (3) that the employer’s desire to retaliate against him was a determinative factor in an adverse employment decision. Tate v. Dept of Mental Health, 419 Mass. 356, 364 (1995).
Here, Montlouis’ claim of retaliation is based solely on his comments to Wood regarding Wood’s proposal to promote Sweeney. According to Montlouis, when Wood asked him how he felt about the promotion, he told Wood “that it would be unfair to me, that [sic] basically would affect me at Pirus." Montlouis admits that he does not allege that Wood discriminated against him on the basis of his race or national origin in failing to consider him for this promotion, so Montlouis’ objection to Sweeney’s promotion could not have been intended (or reasonably understood) to mean that Montlouis was telling Wood that he believed that Sweeney was being promoted over him because of his race or national origin. In short, Montlouis did not believe that Wood was engaging in discrimination in seeking to promote Sweeney, so his objection to that promotion cannot form the basis of a retaliation claim. There is no cause of action under G.L.c. 15IB for retaliating against an employee for objecting to someone else’s promotion when that objection is not based on a claim of discrimination. Moreover, Montlouis has no reasonable expectation of proving that his objection to Sweeney’s promotion, an objection which was shared by others and ultimately resulted in Sweeney not obtaining the promotion, was the motivating cause of any adverse employment action against him. Therefore, summary judgment must be granted on this spurious claim of retaliation.
Since the defendants are entitled to summary judgment as to all the claims brought under G.L.c. 151B, they are also entitled to summary judgment on the common-law claims that rest on the allegation of racial or national origin discrimination, or retaliation. Dziamba v. Warner & Stackpole, LLP, 56 Mass.App.Ct. 397, 409 (2002). Therefore, the defendants shall be granted summary judgment on Montlouis’ claims of wrongful termination based on discrimination and negligent infliction of emotional distress.
4. Claims of Breach of Contract and of the Implied Covenant of Good Faith and Fair Dealing
This Court need not dwell long on Montlouis’ claims that his termination breached his contract with Pirus or the covenant of good faith and fair dealing implicit in every contract. The agreement that Montlouis signed when he commenced his employment with Pirus explicitly provided that Montlouis’ employment would be at-will, stating, “Your employment with Pirus Networks is entirely voluntary for both parties and either you or Pirus Networks may conclude the employment relationship at any time for any reason.” The Stock Option Plan referenced in the written offer of employment also made clear that it should not be understood as a promise of continued employment. In the first sentence of paragraph 9, it declared:
Nothing contained in the Plan or this Agreement shall be construed or deemed by any person under any circumstances to bind the Company to continue the employment of the Employee for the period within which this Option may be exercised, nor shall the Plan or this Agreement create any duty of the Company or any of its affiliates or other shareholders to the Employee, comparable to the duties which partners or joint venturers may owe to each other.
Even if Corley indeed told Montlouis before he accepted Pirus’s offer of employment that he would be employed by Pirus for at least four years and would receive equity in Pirus under its 2000 Stock Option Plan, which provided for a four-year vesting period for those options, these oral statements, even if they were understood by Montlouis to be promises rather than predictions, were superseded by the written employment agreement and the Stock Option Plan, would made explicit that Pirus was making no promise of continued employment. Moreover, any oral promise of employment for a four-year period would be unenforceable because of the statute of frauds. See G.L.c. 259, §1; Powers v. Boston Cooper Corp., 926 F.2d 109, 110 (1st Cir. 1991).
Nor can Montlouis reasonably make any claim of reliance based on Corley’s statements, because his reliance plainly was unreasonable if he read the one-page offer letter that made clear he was to be an at-will employee with no promise of any term of employment. See generally Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 59 (2004) (plaintiffs reliance on oral statements may be unreasonable as a matter of law in light of contrary written statements).
*283 Montlouis’ claim based on the implied covenant of good faith and fair dealing fares no better. The damages that may be awarded to an at-will employee for breach of the implied covenant of good faith and fair dealing are limited to unjust enrichment damages— the amount required to prevent an employer from being unjustly enriched by depriving an employee of money that he had fairly earned and legitimately expected. King v. Driscoll, 424 Mass. 1, 12 (1996); Kravetz v. Merchants Distribs., Inc., 387 Mass. 457, 463 (1982). Montlouis had not yet fairly earned his stock options, because under the Stock Option Plan an employee vested only after four years of employment. Nor could he have any legitimate expectation of obtaining those stock options until he had worked at Pirns for four years in view of the express language of the Plan.
Therefore, Pirns is entitled to summary judgment on Montlouis’ claims that he was promised a four-year employment term and the right to vest in the Stock Option Plan, whether that claim be based in contract, reliance, or the implied covenant of good faith and fair dealing.

ORDER

For the reasons detailed above, this Court ORDERS that defendants’ motion for summary judgment is ALLOWED as to all of plaintiffs claims. Judgment shall enter for the defendants, with statutory costs.

Pirus denies that Montlouis had been instructed to program “burst” instructions and contends that Montlouis’ failure to determine that the DMA chip needed to be programmed to support “single-beat” transactions was unacceptable job performance.