Jesus NAVARRO, Susanna Navarro, and Christian Navarro, Plaintiffs

v.

**U.S. TSUBAKI, INC., Defendant.**

**Civil Action No. 06–30011–MAP.**

United States District Court, D. Massachusetts.

Sept. 17, 2008.

Devin M. Moriarty, Moriarty and Connor, LLC, Springfield, MA, for Plaintiffs.

Timothy F. Murphy, Jay M. Presser, Skoler, Abbott, & Presser, P.C., Springfield, MA, for Defendant.

*MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT* (Dkt. No. 35)

PONSOR, District Judge.

## I. INTRODUCTION

This case raises claims of discrimination brought by a father, mother, and son against their mutual employer. Plaintiffs Jesus, Susanna, and Christian Navarro, all of Mexican heritage, charge that their employer, Defendant U.S. Tsubaki, Inc., discriminated against them on the basis of race and national origin, in addition to discriminating against Susanna on the basis of her gender and retaliating against Christian for exercising his rights to redress such discrimination.

Jesus Navarro, the father, alleges that Defendant discriminated against him on the basis of race and national origin in violation of Mass. Gen. Laws ch. 151B (Count I) and on the basis of disability in violation of Mass. Gen. Laws ch. 151B (Count II). Christian Navarro, the son, alleges that Defendant discriminated against him on the basis of race and national origin in violation of Mass. Gen. Laws ch. 151B (Count III) and retaliated against him for conduct protected by Mass. Gen. Laws ch. 151B (Count IV). Susanna Navarro, the mother, alleges that Defendant discriminated against her on the basis of race in violation of Mass. Gen. Laws ch. 151B (Count V) and on the basis of gender in violation of Mass. Gen. Laws ch. 151B (Count VI). She also charges that Defendant paid her at a rate less than that received by male counterparts performing the same work in violation of Mass. Gen. Laws ch. 149 § 105A (Count VII).

By agreement of the parties, Plaintiffs have voluntarily dismissed Counts II and VII. Defendant has moved for summary judgment on all remaining claims except Count III. For the reasons stated below the court will allow the motion in part and deny it in part.

## II. FACTS

The facts are set out below in the light most favorable to Plaintiffs, noting any material disputes along the way. *Ramirez–Carlo v. United States*, 496 F.3d 41, 50 n. 5 (1st Cir.2007).[1] Unless otherwise

---

1. The court's task was unnecessarily complicated by the Plaintiffs' failure to provide an adequate Rule 56.1 statement. As required under Local Rule 56.1, a party moving for summary judgment must provide a concise statement of the relevant, material facts as to which there is no genuine issue, supported by citations to the record. This local rule serves to focus the attention of the court on the actual issues in dispute and prevents litigants from shifting the burden of organizing evidence onto the court. *Mariani–Colon v. Dept. of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir.2007). A party opposing a motion for summary judgment must respond

to the movant's statement of uncontested fact with its own concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried. Indeed, unless the non-moving party controverts the movant's statements of undisputed fact, the movant's assertions may be deemed admitted for the purposes of the motion. *Stonkus v. City of Brockton Sch. Dep't.*, 322 F.3d 97, 102 (1st Cir.2003).

Defendant Tsubaki has fulfilled its obligations under Local Rule 56.1 and has provided the court with a concise statement of what it believes are undisputed facts in the record. Plaintiffs' response, however, fails to

noted, the court draws the following recitation of facts from Plaintiffs' Concise Statement of the Material Facts of Record as to Which There Exists a Genuine Issue to Be Tried (Dkt. No. 44, Pls.' Statement of Facts) and Defendant's Concise Statement of the Material Facts of Record as to Which There Exists a Genuine Issue to Be Tried (Dkt. No. 36, Def.'s Statement of Facts). The court recounts the facts as alleged by each individual plaintiff.

## A. *Jesus Navarro.*

Jesus Navarro (hereafter, Jesus) began work at Tsubaki's Chicopee manufacturing facility in January 2000 as a forklift operator. He is of Mexican heritage, and Spanish is his first language. As with all Tsubaki workers, Jesus is represented by the United Steelworkers of America, Local 7912 ("the Union"). Within a short time of beginning his employment, Jesus experienced two episodes of harassment from one of his co-workers, Wayne Murray. In one incident, Murray said to Jesus that he "should be in the field picking watermelons" instead of working in a machine shop. (Dkt. No. 44, Pls.' Statement of Facts ¶ 4.) Another time, Murray saw Jesus speaking on his cellular telephone and accused him of using the phone to sell drugs. Both incidents occurred in March 2000. By Au-

gust, Tsubaki moved Jesus to a position in the fabrication department.

A year after the first incidents, in May 2001, Murray resumed his taunting of Jesus. Murray said Jesus should "take his fucking monkey hands" off of a machine. (*Id.* ¶ 8.) Murray also frequently referred to Jesus as "the Mexican." (*Id.* ¶ 6.) This time, Jesus reported Murray's conduct to Mark Miller, Tsubaki's highest-ranking Chicopee employee. Miller called a meeting at which he admonished Murray and others to behave more respectfully towards Jesus. Nevertheless, Murray continued with demeaning comments, suggesting that Jesus perform janitorial duties in addition to his fabrication work. Additionally, Mike Swain, Jesus's immediate supervisor, began to refer to him as "the Mexican" and to tell co-workers to "call to the Alamo" when they needed to reach Jesus. (*Id.* ¶ 11.) Despite Jesus's repeated complaints about this behavior, Miller took no further action.

During the summer of 2002, Jesus applied for a promotion to Group Leader. He was not invited to interview for the position. Others were interviewed, but the position went unfilled. While the position remained vacant, Tsubaki assigned Jesus to perform the functions and duties of a Group Leader. Although white employees

controvert or directly address any of Defendant's assertions. Rather than squarely addressing each of Tsubaki's assertions, Plaintiffs' Local Rule 56.1 filing provides a lengthy narrative of the events underlying this litigation and provides citation for every allegation to attached affidavits. Such an "alternate statement of facts" approach does not satisfy the requirements or fulfill the purpose of Local Rule 56.1. *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir.2007). Under such circumstances, many courts have deemed the moving party's statement admitted. *See, e.g., id.*

Nevertheless, it remains within the court's discretion whether to deem admitted the con-

tents of a moving party's Local Rule 56.1 statement. *Id.* In the present case, the shortcomings of Plaintiffs' filing, while creating additional work for the court, have not obscured the relevant issues to such an extent as to justify the potentially draconian effect of a deemed admission. The court declines to exercise its discretion in this manner and will not deem admitted the contents of Tsubaki's Local Rule 56.1 statement, preferring instead to decide the motion on its merits. Plaintiffs' counsel should recognize, however, that his submission was inadequate and that inadequacy of this sort could be fatal in future cases.

who periodically filled in as Group Leaders received increased pay, Jesus performed the extra duties without any change in title or increase in pay.

Also that summer, Tsubaki denied Jesus a transfer from the second to the first shift. This transfer went instead to Mark Hager, a more senior white employee. Jesus alleges that Hager should have been barred from the job by a company policy that requires workers to remain in a previous position for at least one year before transferring to a new position (the "one year policy"). Though Tsubaki admits that Hager's transfer occurred in violation of this policy, it maintains that it breached the policy pursuant to an agreement with the Union to resolve a separate grievance filed by Hager and not for any discriminatory purpose.[2]

Later in the summer, another Group Leader position opened in the fabrication department. Again, Jesus applied and was not awarded the position. This time, Tsubaki gave the position to a white employee named Gary Martin. Tsubaki assigned Jesus to train Martin for the Group Leader job.

In September of 2002, Jesus applied for and was granted a transfer to the position of first shift assembly line operator. His transfer was not made effective for three months, despite other employees' immediate transfers after their assignments to new positions. While waiting to be transferred, Jesus arranged a meeting with union representatives and the plant manager, who finally saw to it that Jesus began his new shift in late December 2003. Tsubaki acknowledges this delayed transfer, but denies that the delay caused Jesus any

harm since Jesus earned more in the old shift than he did in the new one.

After he was finally transferred to his new shift, Jesus alleges that he was given insufficient instruction and was forced to learn on his own to use a machine on which most employees received six months' training. Jesus also alleges that the white mechanic responsible for the upkeep of the assembly machines refused to repair his machine when it needed work, though the mechanic would repair Jesus's white co-workers' machines. Furthermore, Jesus alleges that his new co-workers continued the harassment he earlier experienced, referring to him as "the Mexican guy" and frequently laughing at him when his machine broke down or when he read his bible during breaks. (*Id.* ¶ 40.) Though Jesus brought some of these incidents to the attention of his supervisors, he alleges that no action was ever taken.

In late April 2003, Jesus applied for another promotion, this time to the job of Tensioner Machine Operator. Although he had the highest rank using the union scale among employees, Jesus was nevertheless denied the position because he had not been in his current job for at least one year. On July 7, 2003, Jesus applied for a position as a Millwright and was again denied because of the one-year policy. The Millwright position was filled by an outside hire, in alleged violation of union procedure. Jesus then applied for a transfer to the position of Chain Assembly Machine Operator and was denied by his supervisor, who tore up the transfer request before Jesus's eyes. When Jesus asked why he had been denied the transfer, the supervisor told him that he had not yet

---

**2.** Over a year earlier, Hager had been passed over for a transfer to the day shift, and he filed a grievance with the union. While the grievance was being considered, Tsubaki awarded Hager a different position. Because the Union believed that Hager had been entitled to the previous day shift position, when the new day shift position opened in 2002, the union agreed to waive the one-year rule so that Hager could take the assignment.

been in his position for one year and that the position would be awarded to a white co-worker. The supervisor subsequently gave the transfer to a white employee.

On August 13, 2003, Jesus injured his shoulder while on the job. On the advice of Tsubaki's occupational health physician, Jesus returned to work but with several restrictions: Jesus was not to lift any weight greater than ten pounds, to raise his arm above his head, or to engage in any repetitive motions. Jesus alleges that Tsubaki did not immediately assign him to appropriately light duty, instead periodically giving him strenuous work for many shifts in the wake of his injury.

Two days after Jesus's injury, his son, Christian Navarro, was also injured on the job and placed on light duty. On August 16, 2003, Tsubaki hired an investigator to conduct surveillance of Christian to determine whether his off-site conduct was consistent with his claimed injuries. The investigator allegedly videotaped Jesus and Christian installing a satellite television dish at the home they shared. Tsubaki asserts that the video showed Jesus supporting the dish with his injured arm, using a power drill and frequently lifting his arm—all in apparent violation of his occupational health restrictions. In September, after viewing the video, Tsubaki conducted several interviews with Jesus, during which he vigorously denied that he engaged in any of the activities Tsubaki claimed were shown on the videotape.

On September 15, 2003, Tsubaki fired Jesus on the grounds that he had fraudulently received benefits on the basis of a false or exaggerated claim of injury and then directly lied about his conduct.[3] Tsubaki filled Jesus's position with a white employee. On the same day that Jesus lost his job, Tsubaki also terminated another, non-Mexican employee for benefits fraud based on videotape evidence.

Jesus filed an administrative complaint with the Massachusetts Commission Against Discrimination ("MCAD") on January 29, 2004, in which he alleged that Tsubaki had discriminated against him on the basis of race, national origin, and physical handicap. On February 5, 2004, Tsubaki received notice of this claim in the form of a letter from MCAD dated February 3, 2004.

Tsubaki reinstated Jesus in October 2004. In the wake of his firing, his MCAD filing, and his reinstatement, Jesus claims that his supervisors watched him constantly.

In April 2005, Jesus applied for and was denied a first shift position. Jesus alleges that he had more experience and more points under the Union system than his co-workers who also applied for the job; however, Tsubaki awarded the position to a white co-worker with a lower classification than Jesus. This episode was repeated in January 2006, when Jesus again applied for and was denied another Group Leader position. George Haas, the white employee who received the position, allegedly should have been disqualified under the one-year policy. Similarly, in June of 2006, Jesus was overlooked for a promotion and was then called upon to train the less-qualified person who had been awarded the job.

---

**3.** In response to his firing, Jesus filed a union grievance against Tsubaki in which he claimed that all of the activities captured on the videotape were in conformity with the restrictions imposed by his occupational health physician. On June 24, 2004, an arbitrator found that Jesus had not violated any occupational prohibitions and ordered him reinstated with back pay. Tsubaki complied with this order, and Jesus returned to work that October.

In September 2006, Jesus applied for another new position. This time, he was required to take a test in English. When he requested that the test be read in Spanish to him, Tsubaki denied his request, although non-native English speakers were usually permitted to have such tests read to them. Jesus declined to take the test and was not awarded the position. Tsubaki maintains that Jesus has competently worked and communicated in English throughout his employment.

Jesus asserts that despite his serial non-promotions, he spends as much as twenty-five hours a week repairing machines—a job that should be paid three dollars per hour more than the wage he receives. Jesus contends that the differential between his pay rate, his nominal position, and his actual responsibilities reflects an ongoing pattern of discriminatory treatment. Nevertheless, following his reinstatement, Jesus remains employed at Tsubaki's Chicopee plant.

Finally, Jesus asserts that throughout his entire tenure at Tsubaki, he has frequently discussed these incidents of harassment, as well as the promotion and transfer denials, with his wife Susanna and his son Christian.

## B.  *Susanna Navarro.*

On February 28, 1991, Tsubaki hired Susanna Navarro (hereafter, Susanna) as an assembler in its roller chain division. She is of Mexican heritage like her husband. Throughout her employment with Tsubaki, Susanna has been represented by the Union. Between 1991 and 2002, Susanna bid for and received three transfers to new positions, some of which included pay raises. In 2002, Susanna took a position as a tool control technician, during which tenure she was the only woman at the Chicopee facility to hold that position. Additionally, sometime that year, Susanna applied for a Group Leader position; Tsu-

baki awarded the position to a less-senior white co-worker.

Throughout 2002, Susanna alleges that her co-workers ridiculed her limited English and derided her gender with comments such as "this job is not for women" and "[w]hen are women going to become smarter than this?" (Dkt. No. 44, Pls.' Statement of Facts ¶ 19.) One co-worker, Dan Vautrain, frequently responded to Susanna's comments by saying, "[W]hat? What?" or "I do not understand you." (*Id.* ¶ 20–21.) Though Susanna brought these incidents to the attention of her plant manager and human resources, neither took any action. In December of 2002, a Tsubaki employee named Andy Sienkiewicz mocked Susanna by shouting "Jesus is coming! Jesus is coming!" in front of Susanna's gathered co-workers, who laughed at her apparent confusion and embarrassment. (*Id.* ¶ 38.)

In 2003, Sienkiewicz held out his hand to her and told her in effect that she could fix any finger but the middle one, which Susanna found offensive and disrespectful. (*Id.* ¶ 59.) In late summer of that year, Susanna again complained to her supervisor; again, no action was taken. On September 25, 2003, Susanna applied for but was denied the position of Quality Assurance ("QA") inspector. Susanna alleges that Tsubaki awarded the position to a less-qualified white co-worker.

In October, a co-worker identified only as Derek asked Susanna to tighten several screws for him-a job that employees usually did for themselves. He then threatened to report her to her supervisor if she refused and encouraged a gathering of co-workers to "watch what Suzie's face will do right now." (*Id.* ¶ 101.) When Susanna became upset, the group laughed at her.

Susanna reported this incident to her supervisor, but he made crying noises and told her that he was growing weary of her

complaints. Due to the lack of response from her superiors, Susanna chose not to report a second incident the same month in which a co-worker commented, in a manner she found offensive, that her dress looked nice with her skin color. (*Id.* ¶ 108.) Throughout 2003, Susanna claims that she complained about the harassment she faced on the job to her supervisor during weekly meetings, as well as to the plant manager at least one other time. However, none of her complaints produced action. According to Susanna, her supervisor acknowledged her co-workers' inappropriate conduct but told her that he had no answers.

In March of 2004, Susanna applied for and was denied a Group Leader position. In conformity with the requirements of the CBA, Tsubaki rated the candidates for the position and awarded the position to John Hebert, the most senior employee who applied for the job. Susanna claims that Herbert was a white applicant with a poor attendance record and a history of conflicts with female co-workers. Susanna further claims that she was better qualified than Hebert and had a superior work record. However, Tsubaki asserts that Herbert had earned a score of nineteen under the ranking system, while Susanna had earned a score of eleven.

On July 15, 2004, Susanna filed an administrative complaint with the MCAD, in which she alleged that Tsubaki discriminated against her on the basis of her gender and national origin.

In 2005, Susanna applied for and was awarded the position of QA Inspector. Susanna was passed over for promotion in August 2007, when she applied for but was denied a promotion to a Group Leader position. She claims that she was more qualified than the person who was awarded the position.

In December 2006, almost a year after this suit was filed, an unidentified co-worker presented Susanna with a photocopied page containing images of a highway and the Statue of Liberty. Along the highway were positioned signs that read "Leaving Mexico Entering Meximerica" and "Welfare Department 1/4 mile, Social Security 3/4 mile, Free Medical 1 and 1/4 miles." (*Id.* ¶ 162.) The page contained a caption that read: *"LATEST POLLING SHOWS:* Forty-three percent of all Americans say that illegal immigration is a serious problem. The other fifty-seven percent said 'No hablo ingles.'"* (*Id.*) Susanna reported this incident to Tsubaki's human resources manager. The record does not indicate that Tsubaki took any action.

Susanna remains employed at Tsubaki's Chicopee plant. Like Jesus, Susanna asserts that throughout her entire tenure at Tsubaki, she has frequently discussed these incidents of harassment, as well as the promotion denials, with her husband and her son Christian.

## C. *Christian Navarro.*[4]

Tsubaki hired Christian Navarro (hereafter, Christian) in 2001 as a machine operator in its guide assembly department. Like his parents, Christian is of Mexican heritage and is represented by the Union. In the fall of 2002, Christian applied for a Group Leader position (the same position his father applied for at that time). Tsubaki awarded the position to a less-qualified co-worker, whom Christian later had to train.

In April 2003, Christian received the first of several written warnings, this one

---

4. In addition to reciting the facts surrounding Christian's retaliation claim, the court includes his allegations of harassment and job status discrimination since his parents rely in part on these facts to sustain their burden of establishing a hostile work environment on the basis of race discrimination.

for failing to return to his work station after he got back to work late following his lunch break. In August 2003, he received two separate written warnings for leaving his work area without permission. Christian alleges that his white co-workers were not written up, despite engaging in similar behavior. On August 13, 2002, while he was talking to a co-worker about their shift instructions, a supervisor began yelling at him. Christian claims that his white co-workers were not treated in this manner.

Twice during this time period, Christian alleges that he was passed over for promotions. First, in July 2003, Christian applied for a position in another department. Christian alleges that Tsubaki incorrectly calculated his experience points and thus awarded the position to a white co-worker. Second, on August 25th, Tsubaki awarded to a white co-worker another position for which Christian had applied. Christian alleges that he had more seniority and points than the co-worker who was awarded the job.

On August 15, 2003, Christian injured his hand on a machine. Tsubaki placed him on light duty, but also engaged an investigator to videotape Christian's activities outside work to see if his injury claim was valid. Christian claims that he was singled out for video surveillance based on bias against his Mexican ancestry. Two days after his injury, Tsubaki gave Christian a disciplinary warning for bypassing the safety system on his machine.

On August 29, 2003, while on his way to work, Christian's car broke down. He called Tsubaki to say that he would not be going to work because of car trouble. Tsubaki thereafter suspended Christian

without pay for three days, beginning on September 2, 2003, for leaving the worksite without permission when he was scheduled to work.[5] Christian claims that, at the time, Tsubaki gave him no reason for the suspension. Tsubaki later issued Christian a written warning for failing to remain at work on August 29, 2003.

After his suspension, Christian alleges that he experienced several incidents during which his supervisor or co-workers singled him out because of his race. Two white co-workers began shouting, "Oh, that Mexican!" whenever a machine that Christian previously worked on broke down. (Dkt. No. 44, Pls.' Statement of Facts ¶ 90.) In another incident, Christian requested that his supervisor allow him to come to work prior to his shifts in order to obtain overtime hours. Christian claims that the supervisor denied his request but allowed the same request by another, non-Mexican employee. The same supervisor told Christian that he would be required to work overtime hours at the supervisor's discretion and that his failure to do so would be considered job abandonment that would subject him to discipline. Christian claims that the supervisor knew that union rules prohibited Tsubaki from dictating overtime hours to its employees and that the supervisor's assertions were intended to harass him.

Christian alleges that the supervisor's harassment continued through October, when he was singled out from his white co-workers on multiple occasions for talking to fellow employees during his shift or for briefly leaving his machine. Despite similar conduct, the supervisor did not yell at Christian's white co-workers. Christian

---

5. There is some disagreement between the parties as to the date Tsubaki meted out the suspension. Whether on September 2nd, 4th or 5th, the precise date is irrelevant for the purposes of this recitation. Additionally, there is some confusion about whether Christian ever made it to work at all the day he had car trouble. This dispute is not material to the court's analysis.

brought these complaints to his union representative, but nothing was done. On October 29, 2003, Tsubaki issued a final disciplinary warning to Christian for insubordinate conduct after an incident where he called his supervisor an "ass." (Dkt. No. 36, Def.'s Statement of Facts ¶ 80.)

In January 2004, Christian received another written warning for returning late from his lunch break. Then, on February 3, 2004, Tsubaki terminated Christian for continuous disregard of workplace rules. Christian contends that Tsubaki fired him after receiving his father's MCAD complaint and learning that Christian had assisted his father in filing the complaint. Tsubaki later replaced Christian with a white employee.

Christian filed his own administrative complaint with the MCAD on April 30, 2004. In his complaint, he alleged that Tsubaki had discriminated against him on the basis of his national origin. A later-amended complaint included a claim of retaliation for assistance he had provided to Jesus in the preparation and submission of his father's MCAD filing. In September 2004, following negotiations between Tsubaki and the Union, Christian returned to work at Tsubaki's Chicopee facility and his personnel file was cleared of his earlier disciplinary warnings.

Since returning to work Christian has been promoted twice and has received praise from his supervisors for the quality of his job performance. However, Christian alleges that he continues to feel harassed at work. Once, he started a shift and found that his co-workers had purposely disarranged his work area. Christian also generally claims that Tsubaki has passed him over and assigned coveted overtime shifts to less-experienced white co-workers. In 2006, Christian received two written warnings for insubordination, though white co-workers were not disciplined for similar behavior. On February 20, 2008, Christian found on his lunch box a note that read, "RAT FAMILY." (Dkt. No. 44, Pls.' Statement of Facts ¶ 176.) He reported the incident, but no action was taken. Like his parents, Christian remains employed at Tsubaki.

Finally, Christian asserts that throughout his tenure at Tsubaki, he has frequently discussed these incidents of harassment, as well as the promotion and overtime denials, with his mother Susanna and his father Jesus.

## III. DISCUSSION

Defendant has moved for summary judgement on four of the five surviving counts asserted by Plaintiffs. The court must grant Defendant's motion only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if it "may reasonably be resolved in favor of either party at trial." *Cordi–Allen v. Conlon*, 494 F.3d 245, 249 (1st Cir.2007)(quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990)) OR (citation omitted). When determining whether there is a genuine issue, the court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 42 (1st Cir.1999). However, "[w]here ... the nonmovant has the burden of proof and the evidence on one or more of the critical issues in the case 'is ... not significantly probative, summary judgment may be granted.'" *Davila v. Corporacion De P.R. Para La Difusion Publica*, 498 F.3d 9, 12 (1st Cir.2007) (citation omitted).

Defendant advances several arguments for granting summary judgement in its favor. Some of the arguments are specific to certain counts; others overlap with several counts. The court will first address

Defendant's federal preemption argument since it goes to the entire complaint. Next the court will address Count IV, because the lack of record support for this retaliation claim is especially glaring. Finally, the court will address Counts I, V and VI together because the issues there overlap considerably.

A. *Preemption Under Section 301 of the Federal Labor Management Relations Act.*

■ As a preliminary matter, Tsubaki argues that the supremacy of federal law in the realm of labor relations precludes the application of Massachusetts anti-discrimination law to the Navarros' claims. Under this theory, because the terms of the Navarros' employment are governed by a collective bargaining agreement ("CBA"), § 301 of the Federal Labor Management Relations Act restricts Plaintiffs' remedies to those provided in the contract between Tsubaki and the Union. 29 U.S.C. § 185 (2000); *see also Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 405–06, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988) ("[I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law ... is pre-empted and federal labor-law principles—necessarily uniform throughout the Nation—must be employed to resolve the dispute."). Tsubaki contends that the validity of its promotion and termination decisions necessarily depends on an interpretation of the CBA, and that application of Chapter 151B to these decisions would generate the inconsistencies that *Lingle* addressed. *Id.*

■ Tsubaki's reasoning, however, is applicable only to suits premised on the violation of contracts between employers and the unions representing their employees. As *Lingle* makes clear, statutorily prohibited discrimination cannot be rendered permissible under any proper inter-pretation of a CBA. *Id.* at 407, 108 S.Ct. 1877; *accord Ralph v. Lucent Techs.,* 135 F.3d 166, 171 (1st Cir.1998). Since no interpretation of a CBA could validate Tsubaki's conduct toward the Navarros if that conduct was motivated by discriminatory animus prohibited pursuant to Chapter 151B, it follows that the interpretation of any relevant CBA terms will not be determinative in this case. *See Livadas v. Bradshaw* 512 U.S. 107, 123, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) ("[Section] 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law.")

The essence of Plaintiffs' claim is that Tsubaki deprived them of statutory rights guaranteed by Massachusetts law. While the reference to the promotion and termination provisions of the CBA may be relevant to the analysis of this claim, resolution of the claim does not in any way "depend" on contract interpretation. The rights guaranteed to the Navarros by Chapter 151B exist independent of any labor contract or CBA; as such, the principles mandating preemption under § 301 are inapplicable here.

B. *Count IV—Christian's Unlawful Retaliation Claim.*

■ Mass. Gen. Laws ch. 151B, section 4 prohibits employers from discriminating against any person in retaliation for exercising his or her rights under this chapter. Mass. Gen. Laws ch. 151B, § 4(4) (2008). The three preliminary elements of a retaliation claim are (1) that the plaintiff engaged in some protected conduct, (2) that the plaintiff suffered some adverse employment action, and (3) that there was a causal connection between elements (1) and (2). *Noviello v. City of Boston,* 398 F.3d 76, 88 (1st Cir.2005).

■ Incorporated into the third element is the requirement that the plaintiff show

that the defendant had knowledge of the protected conduct. If the defendant did not know that the plaintiff undertook conduct that was protected, then any subsequent adverse employment action cannot be linked to the protected conduct. *See Hazel v. U.S. Postmaster General*, 7 F.3d 1, 3 (1st Cir.1993); *Brissette v. Franklin County Sheriff's Office*, 235 F.Supp.2d 63, 93 (D.Mass.2003) (stating that "the plaintiff must demonstrate at a minimum that 'the alleged retaliators knew of the plaintiff's protected activity and that a retaliatory motive played a part in the adverse employment actions alleged'") (quoting *Lewis v. Gillette, Co.*, 22 F.3d 22, 24 (1st Cir.1994)).

■ Once a plaintiff has put forth a *prima facie* case of retaliation, the burden shifts to the defendant to produce a "plausible, legitimate, and nondiscriminatory justification" for the adverse employment action. *Hazel*, 7 F.3d at 3. Then, if the defendant meets this burden of production, the plaintiff has the "burden of proving that the articulated nonretaliatory reasons were pretext." *Mole v. Univ. of Mass.*, 442 Mass. 582, 814 N.E.2d 329, 338 (2004).

■ In this case, Christian argues that Tsubaki fired Christian for assisting his father, Jesus, in filing a complaint with the MCAD.[6] At the outset, Christian faces the hurdle of satisfying the first element of a *prima facie* case of retaliation. Although Christian argues in his memorandum in opposition that he engaged in protected conduct, his Rule 56.1 statement does not contain a single allegation of fact regarding his assisting Jesus with the MCAD complaint.

This same absence of support in the record erodes the basis for the third ele-

ment of his retaliation claim. In his memorandum in opposition, Christian argues that Tsubaki knew he had engaged in protected conduct, because the date of Christian's firing, February 3, 2004, was the same date on the MCAD letter to Tsubaki notifying it of Jesus's MCAD complaint. Again, there is nothing in Plaintiffs' Rule 56.1 statement to support this allegation. *Lewis v. Gillette Co.*, 22 F.3d 22, 24 (1st Cir.1994) ("At a minimum, there must be *competent evidence* that the alleged retaliators knew of the plaintiff's protected activity . . . .") (emphasis added).

Indeed, the record facts are directly contrary to counsel's unsupported proffer. Defendant's Rule 56.1 statement confirms that Jesus's MCAD complaint was dated February 3, 2004, and that Tsubaki did not receive it in the mail until February 5, 2004—two days after Christian's firing. Defendant denies knowing that Christian had engaged in protected conduct at the time of his termination, and no evidence of record contradicts this denial.

■ Christian relies on temporal proximity to show the causal connection between his protected activity and his being fired. It is well established that evidence of an adverse employment action's temporal proximity to a plaintiff's protected activity may be sufficient in some cases to avoid summary judgment. *Mesnick v. General Electric Co.*, 950 F.2d 816, 828 (1st Cir.1991) (citing *Rowlett v. Anheuser–Busch*, 832 F.2d 194, 202 (1st Cir.1987)); *Mole v. Univ. of Mass.*, 442 Mass. 582, 814 N.E.2d 329, 341 (2004) (reviewing federal appellate decisions where a temporal relationship was enough to support an inference of causation). *But see MacCormack*

---

**6.** There is no question that assisting another in exercising his or her protected conduct is itself protected conduct. *Mole v. Univ. of Mass.*, 442 Mass. 582, 814 N.E.2d 329, 338 n. 13 (2004). (stating that "protected activity consists of 'aid[ing] or encouraging any other person in the exercise or enjoyment of' any right under G.L. c. 151B") (citing Mass. Gen. Laws ch. 151B, § 4(4A)).

*v. Boston Edison Co.*, 423 Mass. 652, 672 N.E.2d 1, 8 n. 11 (1996) ("The mere fact that one event followed another is not sufficient to make out a causal link."). These authorities, however, do not give effect to the element of temporal proximity where no record evidence suggests that the defendant even *knew* of the protected activity, whenever it occurred.

Christian's reliance on the sequence of events overstates the power of the inference that can arise from these facts in another way. Temporal proximity may satisfy the element of causation in the summary judgment context only where a plaintiff has otherwise been a satisfactory employee. *Mole*, 442 Mass. at 589, 814 N.E.2d 329; *cf. Ianetta v. Putnam Invs., Inc.*, 183 F.Supp.2d 415, 426–27 (D.Mass. 2002) (granting summary judgment in favor of employer where, despite temporal proximity of termination to filing of administrative complaint, plaintiff's poor performance during previous two years justified termination); *Dziamba v. Warner & Stackpole LLP*, 56 Mass.App.Ct. 397, 778 N.E.2d 927, 935 (2002) (finding no support for retaliation claim where warnings of unsatisfactory work and choice not to raise salary had begun before plaintiff exercised his protected rights). Here, Christian had a long track record of disciplinary actions for various violations of workplace rules, including the receipt of a final warning in October 2003, well prior to his unknown protected activity. Even viewing the facts in his favor, Christian does not fit the formulation of an employee with a satisfactory work record who is suddenly terminated after exercising his or her rights under Chapter 151B.

Finally, even if Christian had made out a *prima facie* case, Tsubaki has met its burden of providing a legitimate nondis-criminatory reason for firing him.[7] As stated earlier, Christian had a long employment record of disciplinary warnings. Tsubaki's claim that it discharged Christian for repeated disregard of company rules satisfies any burden on the defendant to come forward.

Because Defendant has put forth a lawful reason for Christian's firing, he must now show that the reason is actually a pretext for retaliation. On this, Plaintiff is silent. Because Christian offers no evidence tending to show that Defendant's reason was pretextual, the court must conclude that his retaliation claim fails. The court will allow summary judgment as to Count IV.

### C. Counts I, V, and VI—Discrimination on the Basis of Race, National Origin, and Gender.

Before the court addresses the remaining counts substantively, two preliminary issues require discussion. First, Defendant argues that it is entitled to summary judgment on Susanna's claim for racial discrimination, based on the insufficiency of her administrative claim. Second, Defendant claims entitlement to summary judgment because many of the claims of Susanna and Jesus were not timely filed.

#### 1. Insufficiency of Susanna's Administrative Claim.

Massachusetts law requires that a plaintiff file an administrative complaint of discrimination under Chapter 151B before the plaintiff can pursue claims in state or federal court. Mass. Gen. Laws ch. 151B, §§ 5–9 (2008). *See Lattimore v. Polaroid*, 99 F.3d 456, 464 (1st Cir.1996) (stating that the purpose of the administrative filing requirement is "to provide

---

7. In the memorandum in opposition, plaintiff contends that Tsubaki has offered no legitimate reason for terminating Christian. The court cannot agree. Plaintiff's own account of his employment history is replete with disciplinary actions, including a final warning.

the employer with prompt notice of the claim and to create an opportunity for early conciliation"); *Perch v. City of Quincy,* 204 F.Supp.2d 130, 132–33 (D.Mass. 2002). A plaintiff must therefore file charges with the MCAD, and those charges must describe the "essential nature of the claim and . . . identify the core facts on which it rests." *Lattimore,* 99 F.3d at 464. Though the MCAD complaint is not "a blueprint for the litigation to follow," *Powers v. Grinnell Corp.,* 915 F.2d 34, 38 (1st Cir.1990), the court will not permit a plaintiff to pursue claims that fall "outside the scope" of the MCAD complaint. *Id.* at 37; *see also Perch,* 204 F.Supp.2d at 133; *Swallow v. Fetzer Vineyards,* 46 Fed.Appx. 636, 644–45 (1st Cir. 2002).

▮ In judging whether a plaintiff has met the Chapter 151B filing requirement, the court must determine if the civil complaint contains charges that were not described in the MCAD complaint and that cannot "reasonably be expected to grow out of" the charges that were contained in the MCAD complaint. *Lattimore,* 99 F.3d at 464; *Edwin v. Blenwood Assocs.,* 9 F.Supp.2d 70, 73 (D.Mass.1998) (stating that the inquiry is whether the plaintiff's claim "reasonably was within the scope of MCAD's investigation of [the] administration charge"). "Additional claims may proceed when they 1) allege the same type of discrimination and 2) are based on the same type of conduct as the administrative charge." *Perch,* 204 F.Supp.2d at 133. Where a plaintiff has filed the administrative charge *pro se,* as was done here, the court must accord the complaint "the benefit of any reasonable doubt" as to the facts and theories that form the basis of the claim. *Lattimore,* 99 F.3d at 464.

▮ In this case, Tsubaki argues that Susanna's claims of racial discrimination are beyond the scope of her MCAD complaint. Because Susanna's MCAD charge

alleged discrimination on the basis of national origin and gender, Tsubaki urges the court to find that Susanna's racial claims are barred. Tsubaki argues that it would be unreasonable to assume that claims and factual allegations regarding gender and national origin discrimination could extend to racial discrimination too.

Tsubaki's argument on this point cuts too fine. Claims of national origin discrimination are not so different from claims of racial discrimination that the defendant may reasonably claim to be caught off guard by the allegations. This is especially true here where the claims are based on the same set of facts. *See id.* Though Susanna checked the national origin box on her MCAD complaint, the factual allegations within the complaint include reference to her feeling singled out because of being "Hispanic," as well as "Latino." (Dkt. No. 36, Def.'s Statement of Facts, Exh. 24 at 4–5.) Susanna's allegations of her mistreatment are the same, even if her theory is now that Tsubaki's discriminatory animus was motivated by her race instead of her national origin. Because Susanna's administrative complaint adequately puts Defendant on notice as to the general scope of the charges of discrimination and because the allegations of racial discrimination fall within the scope of the investigation of the administrative charge, the court finds that Susanna has met the Ch. 151B exhaustion requirement.

### 2. Limitations Periods for Claims Under Chapter 151B.

Defendant attacks the remaining three claims—Counts I, V, and VI—based on violations of the Chapter 151B limitations period. Claimants seeking to recover under Chapter 151B must comply with two separate limitation periods: one for the filing of their civil action in court, and one

for the filing of their administrative complaint with the MCAD. The applicable limitations period for bringing a civil action in court is "three years after the alleged unlawful practice occurred."[8] Mass. Gen. Laws Ch. 151B, § 9 (2008). The applicable limitations period for filing an administrative complaint is 300 days.[9] *Id.* § 5.

"By the plain language of the statute, the limitations period begins to run at the time of the 'act of discrimination.'" *Ocean Spray Cranberries, Inc. v. Mass. Com'n Against Discrimination,* 441 Mass. 632, 808 N.E.2d 257, 266 (2004). For allegations of discrimination which involve discrete incidents of discrimination, the court's task of calculating when the limitations period has run is straightforward. For example, where the "act of discrimination" is a failure to promote because of discriminatory animus—as is the case here—the court calculates the limitations period starting on the date of the denial of the promotion. *Id.; see Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.").

An exception to the plain language of the statute, the continuing violation doctrine, has been applied by courts to permit plaintiffs to pursue claims that would otherwise fall outside the limitations period. *See, e.g., Silvestris v. Tantasqua Regional Sch. Dist.,* 446 Mass. 756, 847 N.E.2d 328, 338 (2006); *Cuddyer v. Stop & Shop,* 434 Mass. 521, 750 N.E.2d 928, 936 (2001); *Ingram v. Brink's, Inc.,* 414 F.3d 222, 229 n. 9 (1st Cir.2005). Allegations of discrimination based on continuing violations may be supported by actions occurring outside the relevant limitations period, so long as they are anchored by a related action which occurred within the limitations period and so long as the earlier actions were insufficient to trigger the claimant's duty to assert a claim. *Ingram,* 414 F.3d at 231. Thus, the 300–day limitation will "not be a bar to filing in those instances where facts are alleged which indicate that the unlawful conduct complained of is of a continuing nature." 804 Mass.Code Regs. 1.10(2) (2008).

The doctrine of continuing violations is frequently applied in discrimination actions involving claims of hostile environment. Unlike claimants alleging workplace discrimination predicated on distinct acts of bias, hostile work environment claimants seek recovery based on the cumulative effect of numerous acts of discrimination. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Statutory limitations periods are inapposite to the consideration of hostile work environment claims, because the discrimination alleged in "[s]uch claims [is] based on the cumulative effect of individual acts" that might not support recovery as freestanding events. *Id.* at 115, 122 S.Ct. 2061.

---

**8.** Defendant does not argue that Plaintiffs failed to comply with the limitations period for filing this civil action.

**9.** In August of 2002, the Massachusetts legislature amended section 5 to extend the period for filing an administrative complaint from six months to 300 days. The amendment provided that the new, longer limitations period would apply only to claims arising after November 5, 2002, the effective date of the act. 2002 Mass. Acts 223., St.2002, c. 223,

§ 1. Thus, for any discrete discriminatory action which occurred before November 5, 2004, a plaintiff must file a claim with the MCAD within six months of the alleged act of employment discrimination in order to recover under Chapter 151B. For claims arising after November 5, 2004, the limitations period is extended to 300 days from the alleged act of employment discrimination. Mass. Gen. Laws ch. 151B, § 5; 2002 Mass. Acts 223.

Thus, so long as the Navarros identify acts within the statutory period that contributed to the allegedly hostile work environment for which Tsubaki was responsible, they may also recover on the basis of contributing acts that occurred outside of the statutory period. *Id.* at 117, 118, 122 S.Ct. 2061.

■■■ Specifically, for plaintiffs to avail themselves of this doctrine, they must prove "that (1) at least one discriminatory act occurred within the [300–days] limitations period, (2) the alleged timely discriminatory act has a substantial relationship to the alleged untimely discriminatory act(s), and (3) earlier violations outside the [300–days] limitations period did not trigger the plaintiff's awareness and duty to assert her rights."[10] *Ingram v. Brink's, Inc.*, 414 F.3d 222, 230 n. 9 (1st Cir.2005); *Landrau–Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 612 (1st Cir. 2000) ("[W]here a plaintiff alleges a violation within the appropriate statute of limitations period, the continuing violation claim will fail if the plaintiff was or should have been aware that he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place."). Courts have frequently called the event, which falls within the limitations period and rescues the non-timely claims, the "anchoring event." *Noviello v. City of Boston*, 398 F.3d 76, 86 (1st Cir.2005); *Manno v. BJ's Wholesale Club*, 150 F.Supp.2d 325, 332 (D.Mass.2001); *Clifton v. Mass. Bay Transp. Authority*, 445 Mass. 611, 839 N.E.2d 314, 315 (2005).

Jesus and Susanna each allege violations of ch. 151B under both a job status discrimination theory and a hostile environment theory. Because the calculation of the limitations period involves different considerations for each theory, the court will consider each in turn.

### a. Job Status Discrimination.

Each of the Navarros filed complaints with MCAD on different dates creating different limitations periods for their claims.

Jesus filed his complaint with the MCAD on January 29, 2004. Based on the 300–day limitations period, Jesus is barred from recovering for any discrete acts of discrimination that occurred prior to March 27, 2003. His September 2003 termination falls within the statutory period, as do the following seven other failure to promote or transfer claims: the April 2003 promotion to Tensioner Machine Operator; the July 7, 2003 promotion to Millwright;

---

**10.** The Massachusetts Supreme Judicial Court (SJC) has articulated a somewhat different formulation of this third prong in *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 750 N.E.2d 928, 940–41 (2001). Under the First Circuit's characterization of the third prong, which the SJC calls the "revelatory test," a plaintiff could not recover for an incident that would otherwise be part of a continuing violation if at the time of the incident the plaintiff had notice that he or she had an actionable claim. *Id.* at 539–40, 750 N.E.2d 928.

The SJC rejected this standard and set forth its own test, which it identified as "more favorable to a plaintiff." *Id.* The SJC's test "focuses on the plaintiff's knowledge of the hopelessness of her work environment, and allows her to litigate alleged, otherwise time-barred, acts of sexual harassment unless her delay in initiating the lawsuit, considered under an objective standard, was unreasonable." *Id.* at 540, 750 N.E.2d 928. In *Clifton v. Massachusetts Bay Transportation Authority*, 445 Mass. 611, 839 N.E.2d 314, 318 n. 5 (2005), the SJC recognized the applicability of the continuing violations doctrine to claims of hostile work environment based on race.

Though the SJC's test and the First Circuit's test of when to apply the continuing violations doctrine appear to be slightly different, the distinction is of no consequence here, because none of the earlier incidents rise to a level that should have triggered Plaintiffs' awareness.

the late July transfer; the April 2005 transfer to first shift; the January 2006 promotion to Group Leader; the June 2006 promotion; and the September 2006 test for a new position.

Susanna filed her complaint with the MCAD on July 15, 2004. Based on the 300–day limitations period, Susanna is barred from recovering for any acts of discrimination that occurred prior to September 20, 2003. The September 25, 2003, March 2004, and August 2007 incidents of failure to promote fall within the statutory period.

Despite a plethora of discrete claims from various time periods, only the claims identified above may be pursued based on the statutory time restriction.

### b. *Hostile Work Environment.*

In addition to their claims for discrete incidents of discrimination, the Navarros allege that, since 2000, Tsubaki has subjected them to a hostile work environment. If Plaintiffs satisfy the elements of the continuing violations doctrine by showing that there is an anchoring event within the limitations period that has a substantial relationship to the untimely acts, then acts that fall outside the limitations period may be considered as part of their hostile environment claims.

Under this standard, Jesus can arguably anchor his hostile work environment claim with any of the failure to promote or transfer allegations that occurred after March 27, 2003. A jury could find that these incidents bear a substantial relationship to the acts which Jesus seeks to include in his claim but which fall outside the limitations period. The essence of Jesus's hostile environment claim is that he was treated differently from his white co-workers.[11] He alleges that his serial non-promotion was a continuation of this unfair treatment and, as such, is related thematically to Jesus's allegations of earlier, non-timely harassment by his co-workers. Accordingly, the court will permit Jesus's allegations of discriminatory events that occurred prior to March 27, 2003, to be included as part of his claim for a hostile work environment.

In Susanna's case, she has alleged a hostile work environment in both her gender discrimination claim and her race discrimination claim.

Regarding her claim based on gender discrimination, Susanna has not described any incidents after July 15, 2004, that could anchor a hostile work environment claim. The only act that Susanna can offer occurred when an unnamed coworker stated that her dress looked nice with her skin. Susanna claims she was offended by this statement; though it is unclear whether she considered the statement to pertain to her race, her gender, or both. Whatever its import, the statement cannot be considered as substantially related to any earlier incidents in which co-workers derided her gender. Accordingly, all the allegations of incidents which occurred prior to September 20, 2003, are barred.

With respect to the race discrimination claim, Susanna relies on two allegations of failure to promote and one crude and offensive incident involving a cartoon that disparaged Mexicans in the United States to anchor her claims that fall outside the limitations period. These incidents suffice to support the application of the continuing violations doctrine to Susanna's claim of a racially hostile environment. To the extent that Susanna argues that Tsubaki's continual failure to promote her on the basis of her race created a hostile environment, the court will permit Susanna to

---

11. Whether this theory is enough to satisfy the standard for establishing a hostile work environment is an issue the court will address below.

include the earlier incidents as part of Tsubaki's unlawful practice. Likewise, to the extent that she uses her co-workers' comments and behavior as a basis to establish a hostile work environment, the cartoon anchors the earlier incidents.

### 3. Counts I, V, and VI—Substantive Discrimination on the Basis of Race, National Origin and Gender.

Having now disposed of the preliminary issues, the court will address Counts I, V, and VI substantively. Jesus charges in Count I that Tsubaki discriminated against him on the basis of his national origin and his race in violation of Chapter 151B; Susanna charges in Count V that Tsubaki discriminated against her on the basis of her race, and in Count VI on the basis of her gender—both in violation of Chapter 151B. Their allegations aim to support job status discrimination claims and hostile work environment claims. Because the analytical framework for addressing these two types of claims is the same for race and national origin discrimination as well as gender discrimination claims, the court will group the counts together while discussing each type of claim.

#### a. Job Status Discrimination.

■ When "there is no direct evidence of the defendant's [unlawful] animus, the *McDonnell Douglas* burden-shifting framework is used to allocate and order the burdens of producing evidence." *Fennell v. First Step Designs, Ltd.*, 83 F.3d

526, 535 (1st Cir.1996). The parties agree that this well-known analytical framework applies to their claims of failure to promote and wrongful termination.

First, the employee must prove a prima facie case by demonstrating that he or she belongs to a protected class and was denied a position or benefits for which the employee was qualified. The burden then shifts to the employer to present a legitimate non-discriminatory reason for its action. If that is done, the employee is afforded an opportunity to prove that the proffered reason is pretextual. *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 465 (1st Cir.1996) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *Blare v. Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 646 N.E.2d 111, 114 (1995) (stating that "[i]n applying Massachusetts' antidiscrimination statute, it has been our practice to follow the three stage order of proof set forth by the United States Supreme Court").

The parties do not dispute that both Jesus and Susanna are members of protected classes on the basis of either their race or national origin.[12] The parties' arguments, then, rise and fall on whether Jesus and Susanna meet the other elements of the *McDonnell Douglas* framework.

■ Between them, Jesus and Susanna allege ten separate incidents where each was passed over or denied a promotion.[13]

---

**12.** Susanna alleges numerous occasions where she was passed over for promotions that were given to white coworkers. Since she has cast these incidents as racial discrimination and not gender discrimination, the court will treat each failure to promote claim as proceeding solely under the theory of discrimination on the basis of race. Moreover, Plaintiffs' memorandum in opposition to Defendant's motion addresses Susanna's gender discrimination claims under only the hostile environment theory.

**13.** As discussed earlier, the court will consider ten incidents of failures to promote or transfer that fall within the statutory limitations period. For Jesus, those incidents are the April 2003 promotion to Tensioner Machine Operator; the July 7, 2003, promotion to Millwright; the late July transfer; the April 2005 transfer to first shift; the January 2006 promotion to Group Leader; the June 2006 promotion; and the September 2006 test for a new position.

For all but one of these incidents,[14] they allege that they were the better qualified, or most senior, applicant and, in most cases, that the position was given to a white or non-Mexican co-worker. The hurdle is not high for establishing a *prima facie* case of discrimination. Accordingly, under the first stage of the *McDonnell Douglas* framework, Plaintiffs have met their burden.

Because Jesus and Susanna have cleared this first hurdle, the second stage of the *McDonnell Douglas* framework shifts the burden of production to Tsubaki to articulate a lawful, non-discriminatory reason for each instance where Plaintiffs were not promoted or transferred. In every instance except one, Tsubaki has remained silent on its reason for taking such actions. Only for the March 2004 failure to promote Susanna to the position of Group Leader does Tsubaki proffer a legitimate reason for its actions.

■ Tsubaki states that it promoted the employee who applied for the Group Leader position who was most senior among all other employees, including Susanna. Whereas Susanna received a ranking of eleven across seven categories that Tsubaki rated, the employee who received the promotion had a ranking of nineteen. With this averment, Tsubaki has met its burden of production under the second stage of the *McDonnell Douglas* framework.

Next, Susanna bears the burden of proving that Tsubaki's proffered reason for not promoting her in March 2004 is a pretext. She is silent on this issue. Since Defendant has offered a legitimate reason, the inference raised by Susanna's *prima facie* case disappears, and she must now offer evidence of discriminatory motive. As she has none to offer, this claim cannot survive summary judgment.

In summary, for all failure to promote or transfer allegations except the March 2004 failure to promote, Plaintiffs have met their burden in proving a *prima facie* case of discrimination on the basis of race or national origin, and Defendant has offered no alternative reason for its actions. As to the March 2004 claim, Defendant has met its burden of producing a legitimate nondiscriminatory reason for its action, and Susanna offers no proof or argument of pretext. Accordingly, based on this record, the court will allow Defendant's motion for summary judgment as to Susanna's March 2004 claim of racial discrimination under Count V, but otherwise will deny it.

■ In addition to his failure to promote or transfer claims, Jesus charges that Tsubaki's termination of his employment on September 15, 2003, was motivated by racially discriminatory animus. For wrongful termination cases, the SJC has set forth four elements for a plaintiff to prove in order to satisfy the requirements of the first stage of the *McDonnell Douglas* framework. Besides showing (1) that he is a member of a protected class, he must also show "(2) that he performed his

---

For Susanna, those incidents are the September 25, 2003, promotion to Group Leader; the March 2004 promotion to Group Leader; and the August 2007 promotion to group leader.

14. For the July 7, 2003, allegation that Tsubaki failed to promote Jesus to the position of Millwright on the basis of his race or national origin, Jesus does not allege in his Rule 56.1 statement that he was the better qualified—or

even plainly qualified—applicant. He does state with respect to the April 2003 allegation that he was the employee with the most points under the Union's system. It is unclear to the court whether that averment applies to the Millwright position as well. Nonetheless, the court will proceed on the assumption that, as with the earlier promotion, Jesus was the most qualified for the Millwright position.

job at an acceptable level; (3) he was terminated; and (4) his employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's." *Blare v. Husky Injection Molding Sys. Boston,* 419 Mass. 437, 646 N.E.2d 111, 115 (1995).

Tsubaki does not challenge Jesus's ability to make out a *prima facie* case. Accordingly, the court will assume that Jesus has established a *prima facie* case and move on to the second and third phases of the framework.

██ In accordance with the burden shift in the second phase of the *McDonnell Douglas* framework, Tsubaki has proffered a legitimate nondiscriminatory justification for its termination of Jesus: during his assignment to light duty at work because of an employment injury, Jesus engaged in activities outside work in violation of his physical restrictions and then lied when questioned by his supervisors. Because Tsubaki had videotaped proof of Jesus's conduct, it terminated his employment for suspicion of fraud in connection with a work-related injury claim.

As Defendant has offered a lawful reason for Jesus's termination, "the presumption created by the prima facie case drops" and the burden shifts back to Plaintiff to show that Defendant's proffered reason was pretext. *Abramian v. President & Fellows of Harvard College,* 432 Mass. 107, 731 N.E.2d 1075, 1084 (2000). "This burden cannot be met merely by refuting or questioning the articulated reason." *Morgan v. Mass. Gen. Hosp.,* 901 F.2d 186, 191 (1st Cir.1990). Unfortunately for Jesus, all he has to offer to dispute Tsubaki's justification is unsupported allegations and

speculation. *See Lehman v. Prudential Ins. Co. of Am.,* 74 F.3d 323, 327–28 (1st Cir.1996).[15]

Consequently, the court finds that Jesus has failed to produce sufficient evidence that would support a fact-finder's conclusion that Tsubaki's termination of Jesus was motivated by racial discrimination. The court will therefore allow, in part, Defendant's motion for summary judgment on the issue of Jesus's termination in Count I of Plaintiffs' complaint.

b. *Hostile Work Environment Claims.*

██ Jesus and Susanna further allege that they were subject to a hostile work environment because of their race; Susanna additionally charges that she was subject to such an environment because of her gender. For a plaintiff to succeed in a claim for hostile work environment under Chapter 151B, the plaintiff must demonstrate that: (1) he is a member of a protected class, (2) he was subjected to unwelcome harassment, (3) the harassment was based on membership in the protected class, (4) the harassment was severe or pervasive enough to alter the conditions of his employment and create an abusive work environment, (5) the harassment was objectively and subjectively offensive such that a reasonable person would find it offensive, and that the plaintiff did find it offensive, and (6) some basis for employer liability has been established. *Douglas v. J.C. Penney Co.,* 474 F.3d 10, 15 (1st Cir. 2007).

The court will discuss separately the Navarros' claims based on racial discrimi-

---

15. Plaintiffs further contend that Defendant is precluded from litigating the question of the legitimacy of its decision to terminate Jesus because an arbitrator, pursuant to the CBA between Tsubaki and the Union, determined that the termination was violative of company

policy. The court finds no merit to this argument. The issue decided in arbitration had to do with the validity of Jesus's termination under the grievance procedures set forth in the CBA—not whether discriminatory animus motivated Tsubaki's actions.

nation and Susanna's claim based on gender discrimination.

### I. Racially Motivated Hostile Work Environment.

■■■ At the outset, the court must address an evidentiary issue regarding Plaintiffs' hostile work environment claim. The Navarros argue that hostility to *any* member of a protected class within the relevant workplace should be available to an individual plaintiff class member as evidence of a hostile work environment, so long as that individual plaintiff was *aware* of the harassment suffered by other class members. The law within this circuit, while not expressly endorsing such an evidentiary theory, does support the admission, for purposes of summary judgment, of hostile acts toward other members of the same group that are "within the plaintiff's personal knowledge." *Noviello v. City of Boston*, 398 F.3d 76, 84 (1st Cir.2005); *accord Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir.1987) (evidence of hostile acts toward third parties is admissible subject to trial judge's finding of relevance). Other circuits have more explicitly endorsed this concept. *See, e.g., Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir.2001) ("We are, after all, concerned with the 'environment' of workplace hostility, and whatever the contours of one's environment, they surely may exceed the individual dynamic between the complainant and his supervisor."). This reasoning is particularly relevant here, where Jesus and Susanna both live and work with the other persons whose alleged experiences of workplace abuse they want to use as evidence of a hostile work environment. A jury could conclude that the conditions at Tsubaki as felt by Jesus, Christian, or Susanna were all within Jesus's or Susanna's personal knowledge.

Moreover, Jesus's and Susanna's hostile work environment claims do not depend on proof that a specific action was motivated by discriminatory animus. Rather, they are entitled to demonstrate that the totality of the circumstances in which they worked would offend a reasonable person, and that Tsubaki bears some responsibility for that offense. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The court will, therefore, aggregate all the allegations made by the Navarros, including Christian,[16] in determining whether they meet their burdens at each stage of the *McDonnell Douglas* framework.

■■■ It is undisputed that both Jesus and Susanna are members of a protected class. With regard to elements two and three, they have introduced evidence that they were subjected to unwelcome harassment on the basis of class membership. For example, Jesus has offered the following evidence: (1) that co-workers told him that he should be picking watermelons rather than working in a machine shop and described him as a monkey; and (2) that his supervisors referred to asking him for help as "calling the Alamo." In addition, Susanna claims that her co-workers repeatedly pretended not to understand her when she spoke to them because of her accent. Both Jesus and Susanna further allege that they were repeatedly passed over for promotion despite being the better qualified candidates. All of these incidents describe an environment tainted by discrimination on the basis of race and national origin.

---

**16.** Some of the allegations made by Christian Navarro fall outside the limitations period of Chapter 151B. However, those incidents may be considered part of Jesus's and Susanna's claim because the incidents meet the requirements of the continuing violations doctrine.

Tsubaki argues that these diffuse incidents are not enough to show that co-worker harassment had the "purpose or effect of unreasonably interfering" with Jesus's and Susanna's work environment. *Sarin v. Raytheon Co.,* 905 F.Supp. 49, 52 (D.Mass.1995). As the Supreme Court made clear in *Harris v. Forklift Sys., Inc.,* however, the purpose of employment discrimination statutes is to prevent all types of discriminatory conduct that interfere with employees' ability to do their jobs. 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ("[E]ven [harassment] that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers."). Under the summary judgment standard, Jesus and Susanna have alleged numerous instances over a multi-year period of conduct that a jury could find interfered unreasonably with the Navarros' work environment and, therefore, have satisfied the fourth element.

With regard to the fifth element, it is uncontested that Jesus and Susanna found the complained-of conduct subjectively offensive. Moreover, a jury could well conclude that a reasonable person would find comments suggesting that a person is unfit for their job by virtue of their race or national origin objectively offensive as well.

The specific incidents of harassment of which Jesus and Susanna complain occurred primarily at the hands of co-workers. To establish Tsubaki's liability for the conduct of one or more of its non-supervisory employees, the Navarros must show that Tsubaki knew or should have known of its employees' harassing conduct and failed to take prompt and appropriate

action. *Crowley v. L.L. Bean, Inc.,* 303 F.3d 387, 401 (1st Cir.2002).

Viewed in the light most favorable to the Navarros, a reasonable juror could find that Tsubaki knew or should have known of the hostile environment. Jesus alleges he told Mark Miller, Tsubaki's highest-ranking official at the Chicopee plant, about the improper comments to which he was subjected, while Susanna's repeated complaints to her supervisor about the harassment she suffered at the hands of her co-workers were met with mock tears and a lack of interest. A reasonable juror could conclude from such evidence that Tsubaki knew of the co-worker harassment and failed to take prompt and appropriate action.

Finally, Tsubaki contends that the harassment was neither severe nor pervasive enough to be actionable. A jury may agree at trial. For summary judgment purposes, however, Jesus and Susanna have offered enough evidence to entitle them to a trial on this point.

### ii. *Gender Motivated Hostile Work Environment.*

 In addition to her racial discrimination claims, Susanna alleges that Tsubaki discriminated against her on the basis of her gender in creating or allowing a hostile work environment.[17] As noted earlier, to establish her claim, Susanna must demonstrate that "she worked in a sexually hostile environment that unreasonably interfered with her work performance. To sustain that burden, she need[s] to establish that the conduct alleged was sufficiently severe and pervasive to interfere with a reasonable person's work performance." *Muzzy v. Cahillane Motors, Inc.,* 434 Mass. 409, 749 N.E.2d 691, 694 (2001).

---

**17.** As noted earlier, none of the claims for failure to promote allege any facts with respect to Susanna's gender—all are described with respect to the race of applicants and co-workers who received the promotions.

Allegations of statements made by co-workers that offend a plaintiff may not be enough to constitute a hostile work environment. The allegations must establish the existence of conduct so "severe and pervasive" that a reasonable person would find the work environment hostile and abusive. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *quoted in Sarin v. Raytheon Co.*, 905 F.Supp. 49, 54 (D.Mass.1995); *Ritchie v. Dep't of State Police*, 60 Mass.App.Ct. 655, 805 N.E.2d 54 (2004) ("The court has defined this environment as one 'pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization [that] poses a formidable barrier to the full participation of an individual in the workplace.'") (citing *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 750 N.E.2d 928, 937 (2001)).

■ In determining whether alleged conduct rises to this threshold, the court must consider "all the attendant circumstances including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 83 (1st Cir.2006). "Because this inquiry is fact specific, the determination is often reserved for a fact finder, ... but summary judgment is an appropriate vehicle for 'policing the baseline for hostile environment claims.'" *Id.* (citations omitted).

■ The court must conclude on the evidence before it that Susanna cannot establish a claim for hostile work environment on the basis of her gender. Susanna alleges a single episode of harassment on the basis of her gender: the comment by a co-worker about her dress. Though the court acknowledges the reasonableness of feeling bothered by such a remark, no jury could find that it alone created an abusive and hostile environment.

Though the court determined earlier that it would not consider the allegations regarding comments made by co-workers in 2002 about Susanna's gender, even were the court to consider them, the result would be the same. Susanna's account of the comments allege that they occurred throughout 2002 but not beyond. The court cannot consider one year of occasional boorish comments about her job not being suitable for her gender, followed by three years in which only one other incident by a single co-worker occurred, enough to sustain her burden. Though the conduct by Susanna's peers or supervisors may be rude, unfair or unprofessional, it has not met the standard for establishing a hostile work environment.

Finally, Plaintiff asserts that the court should not view the allegations of gender discrimination in isolation from the allegations of racial discrimination. There is some support for aggregating the claims where there is an "interplay between the two forms of harassment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572 (2d Cir. 2000) (stating that a jury could conclude that a supervisor's "racial harassment exacerbated the effect of his sexually threatening behavior and vice versa").

The court does not find Plaintiff's argument persuasive. There is, simply put, no nexus between Susanna's accounts of gender discrimination and her accounts of racial discrimination, no evidence of "interplay" or "exacerbation" that could justify combining Susanna's disparate allegations of harassment. Accordingly, the court finds that Susanna cannot meet the legal standard to establish a claim for hostile work environment on the basis of gender discrimination. The court will grant Defendant's summary judgment motion as to Count VI.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Dkt. No. 35) is hereby ALLOWED on Count I as to all job status discrimination claims based on incidents prior to March 27, 2003, as well as to Jesus's wrongful termination claim. The motion is hereby DENIED on Count I as to any claim for hostile work environment by Jesus Navarro, as well as the following job status discrimination claims: the April 2003 promotion to Tensioner Machine Operator; the July 7, 2003, promotion to Millwright; the late July transfer; the April 2005 transfer to first shift; the January 2006 promotion to Group Leader; the June 2006 promotion; and the September 2006 test for a new position.

The motion for summary judgment on Count IV is hereby ALLOWED *in toto*.

The motion is hereby ALLOWED on Count V as to all job status discrimination claims based on incidents prior to September 20, 2003, and as to the failure to promote claim based on the March 2004 Group Leader position. The motion is hereby DENIED on Count V as to any claim for hostile work environment by Susanna Navarro, as well as the following job status discrimination claims: the September 25, 2003, and August 2007 promotions to Group Leader.

The motion for summary judgment on Count VI is hereby ALLOWED *in toto*.

Counts II and VII are hereby DISMISSED by agreement.

The clerk will set this case for a status conference to address a schedule leading to a prompt trial.

It is So Ordered.